NON-CONFIDENTIAL

———————————————————

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

———————————————————

Misc. No. 14-111

REMBRANDT SOCIAL MEDIA, LP,

*Plaintiff-Petitioner,*

V.

FACEBOOK, INC.,

*Defendant-Respondent.*

———————————————————

On Petition for Permission to Appeal an Order of The
United States District Court for the Eastern District of Virginia
in Case No. 13-cv-158, Judge T.S. Ellis, III

———————————————————————————————

## FACEBOOK, INC.'S NON-CONFIDENTIAL RESPONSE
## TO REMBRANDT SOCIAL MEDIA, LP'S PETITION
## FOR ALLOWANCE OF AN INTERLOCUTORY APPEAL

———————————————————————————————

Heidi L. Keefe
Mark R. Weinstein
COOLEY LLP
3175 Hanover Street
Palo Alto, CA  94304

Michael G. Rhodes
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA  94111

Thomas G. Hungar
   *Principal Attorney*
Lucas C. Townsend
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Tel:  (202) 955-8500
Fax:  (202) 467-0539

*Attorneys for Defendant-Respondent Facebook, Inc.*

# CERTIFICATE OF INTEREST

Counsel for Defendant-Respondent Facebook, Inc. certifies the following:

1.      The full name of every party or amicus represented by me is:

   Facebook, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interested) represented by me is:

   The party named in the caption, Facebook, Inc., is the real party in interest.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   There are no such corporations or companies.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

| **Gibson, Dunn & Crutcher LLP** | **Cooley LLP** |
|---|---|
| Thomas G. Hungar | Stephen R. Smith |
| Lucas C. Townsend | Jonathan G. Graves |
| | Phillip E. Morton |
| | Michael G. Rhodes |
| | Heidi L. Keefe |
| | Mark R. Weinstein |
| | John S. Kyle |
| | Elizabeth L. Stameshkin |
| | Stephen C. Neal |
| | Paul Batcher |

_December 26, 2013_
Date

_/s/ Thomas G. Hungar_
Thomas G. Hungar

i

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................2

   A.  The Relevant Technology ...........................................................2

   B.  Rembrandt's Theory Of Damages................................................4

   C.  The District Court's *Daubert* Ruling And Certification Order...................6

ARGUMENT ...................................................................................8

   A.  The Appeal Satisfies The Standards For Certification Under 28 U.S.C. § 1292(b) And Should Be Heard By This Court. ............................8

   B.  Rembrandt's Characterization Of The Legal Issues Is Inaccurate And Incomplete. .........................................................................11

      1.  Rembrandt Challenges Mere Exercises Of Discretion By The District Court That Are Amply Justified On This Record. .................12

      2.  There Are Substantial Grounds For Difference Of Opinion With Respect To The District Court's Rejection Of Facebook's EMVR Argument. .............................................................16

CONCLUSION ................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Air Measurement Techs., Inc. v. Akin Gump Strauss Hauer & Feld, L.L.P.*,
  206 F. App'x 980 (Fed. Cir. 2006)........................................................8

*Am. Seating Co. v. USSC Grp., Inc.*,
  514 F.3d 1262 (Fed. Cir. 2008) ...........................................................5

*Cornell Univ. v. Hewlett-Packard Co.*,
  609 F. Supp. 2d 279 (N.D.N.Y. 2009) ......................................... 19–20

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)...........................................................................6

*Fujitsu Ltd. v. Tellabs, Inc.*,
  Misc. No. 154, 2013 WL 5098993 (Fed. Cir. Sept. 11, 2013)............10

*Garretson v. Clark*,
  111 U.S. 120 (1884) .............................................................. 12, 13, 18

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) .........................................................................16

*Georgia-Pacific v. U.S. Plywood Corp.*,
  318 F. Supp. 1116 (S.D.N.Y. 1970) ...................................................6

*Katz v. Carte Blanche Corp.*,
  496 F.2d 747 (3d Cir. 1974) .............................................................11

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) ................................................. 14, 17, 20

*Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*,
  895 F.2d 1403 (Fed. Cir. 1990) ........................................................11

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) ..................... 12, 13, 14, 16, 17–18, 20

*Pragmatus AV, LLC v. Facebook, Inc.*,
  No. 11-cv-494, 2011 WL 4635512 (N.D. Cal. Oct. 5, 2011) .............10

# TABLE OF AUTHORITIES
## (*Cont'd*)

**Page(s)**

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010) ...................................................................12

*Riles v. Shell Exploration & Prod. Co.*,
  298 F.3d 1302 (Fed. Cir. 2002) .................................................................12

*Rite-Hite Corp. v. Kelley Co.*,
  56 F.3d 1538 (Fed. Cir. 1995) ...................................................................18

*TWM Mfg. Co. v. Dura Corp.*,
  789 F.2d 895 (Fed. Cir. 1986) ...................................................................18

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ............................................................ 17, 20

*Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*,
  225 U.S. 604 (1912) ...................................................................................14

**Statutes**

28 U.S.C. § 1292(b) ................................................................................. 1, 8, 11

35 U.S.C. § 284 ...............................................................................................13

**Rules**

Fed. R. Evid. 702(c) ........................................................................................16

Fed. Cir. R. 27(m)(1)(B) ...................................................................................1

# ADDENDUM[1]

Hearing Transcript on Facebook's Motion To Exclude
The Testimony of James E. Malackowski ......................................... ADD0244

Excerpts of Deposition of Dr. Jennifer A. Golbeck,
Submitted as Exhibit 4 to Declaration of Paul Batcher
(Dkt. 241) [CONFIDENTIAL] ........................................................... ADD0305

Excerpts of Deposition of Yoram (Jerry) Wind, Ph.D.,
Submitted as Exhibit 8 to Declaration of Paul Batcher
(Dkt. 241) ........................................................................................ ADD0366

Expert Rebuttal Report of Professor Marco Iansiti,
Submitted as Exhibit 7 to Declaration of Paul Batcher
(Dkt. 241) [CONFIDENTIAL] ........................................................... ADD0376

---

[1] To avoid duplicative numbering, Facebook's addendum continues the numbering of Rembrandt's addendum, beginning with ADD0244.

CONFIDENTIAL INFORMATION OMITTED

## INTRODUCTION

Rembrandt Social Media, LP is a non-practicing entity that has sued Face-book, Inc. for ████████ █████[2] on the assertion that two minor software components added on to Facebook's website cause Facebook to infringe two of Rembrandt's patents. But Rembrandt has built its entire theory of damages on a single expert opinion of Mr. James Malackowski, whose estimate of a reasonable royalty is based on the entire stream of advertising revenue that Facebook allegedly derives from a set of features of its website, even though Rembrandt admits that those features do not independently infringe absent the two minor add-ons. The district court excluded Malackowski's opinion as unreliable and prejudicial, leaving Rembrandt with no permissible theory of damages on the eve of trial. Because that admissibility ruling controls whether there is any need to try this case (particularly to a jury), and with the consent of both parties, the district court certified its ruling for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

Facebook agrees that the district court's ruling excluding Malackowski's opinion was properly certified under § 1292(b) and should be reviewed by this Court, but not for the reasons that Rembrandt articulates. Rather, granting this appeal is appropriate because, without the excluded testimony, Rembrandt has no

---

[2] Rembrandt's damages estimate is confidential and has been redacted throughout the non-confidential version of Facebook's response. Fed. Cir. R. 27(m)(1)(B).

admissible theory of damages and, as a non-practicing entity, no equitable claim to injunctive relief.  With no possibility of a meaningful remedy, Rembrandt would have no incentive or legal basis on which to proceed to trial and Facebook would be entitled to judgment as a matter of law.  Thus, immediate appellate review would materially advance the ultimate resolution of the litigation.  In addition, granting this appeal would allow this Court to correct the district court's erroneous holding that the entire market value rule ("EMVR") does not apply in this case.  On these grounds, Facebook strongly supports immediate review.

## BACKGROUND

### A.     The Relevant Technology

Facebook provides a free social networking service to more than 1 billion monthly users through its web address, <http://www.facebook.com>, as well as various other mobile platforms.  ADD0055; ADD0135; ADD0386.  Users who log into the Facebook website can access a number of web pages and use a number of features that allow members, *inter alia*, to share photos, videos, and information about themselves; receive updates on recent activities that have occurred on Facebook; or create pages for businesses and groups.  ADD0055.  Facebook has developed and introduced these features periodically over time.  *See* ADD0055; ADD0160–62.  For example, in September 2006 Facebook introduced the feature known as "News Feed," which displays updates, known as "stories," of the recent

activities of a user's friends.  ADD0055.  Another feature, "Timeline," displays basic information about each user and a history of his or her activities on Facebook; Facebook introduced this functionality in September 2004 under its former name, "Wall."  ADD0055; ADD0161; ADD0392.  The features known as "Photo/Video Sharing," which allows users to share media files, and "Groups," which allows self-selected groups of individuals to associate on Facebook, were also introduced before 2009.  ADD0064; ADD0162.

Rembrandt is a non-practicing entity and owner by assignment of two patents, U.S. Patent Nos. 6,415,316 (the "'316 patent") and 6,289,362 (the "'362 patent").  ADD0050.  Rembrandt has sued Facebook in the Eastern District of Virginia, claiming that two components added on to Facebook's software in 2009—known as BigPipe and Audience Symbol—infringe the '316 and '362 patents when used in conjunction with certain features of Facebook, including Timeline, News Feed, Groups, and Photo/Video Sharing.  There is no dispute that those features successfully and independently existed on Facebook before the onset of any alleged infringement in 2009, and that Facebook continues to provide those features today through mobile applications without infringing.  ADD0064; ADD0392.

BigPipe is a program developed by Facebook and introduced in the fall of 2009 that optimizes the speed at which certain web pages on Facebook are delivered from Facebook's servers to users' web browsers.  ADD0056; ADD0385–86.

3

As Rembrandt's infringement expert has admitted, BigPipe is an "essential component" of all of Rembrandt's infringement theories, and Facebook would not infringe without BigPipe.    ADD0056; ADD0064; ADD0311–12; ADD0315; ADD0320–21; ADD0361.  BigPipe does not affect what content is displayed on a particular Facebook web page; rather, it allows portions of web pages to be delivered to users, on average, one second faster than earlier Facebook technologies. *See* ADD0056; *see also* ADD0260; ADD0282.

Audience Symbol, also introduced in 2009, is a small icon displayed on certain Facebook pages that signifies the audience of users who are allowed to view individual stories.    ADD0057; ADD0386.  As with BigPipe, Rembrandt's infringement expert has admitted that all of Rembrandt's infringement theories with respect to the '316 patent depend on the display of Audience Symbol on preexisting stories.  ADD0056; ADD0316–17; ADD0330–31; *see also* ADD0321–23 (relying on Audience Symbol for infringement of the '362 patent with respect to photo and video stories).

## B.    Rembrandt's Theory Of Damages

Rembrandt's sole theory of damages rests entirely on the expert report of Malackowski, Rembrandt's only damages expert.  ADD0047.  Malackowski did not offer any opinion on what portion, if any, of Facebook's advertising revenue is attributable to the addition of BigPipe and Audience Symbol.  ADD0058.  Rather,

4

he calculated a supposedly reasonable royalty based on an estimate of the total revenue stream from every feature of Facebook that utilizes the allegedly infringing software add-ons as components—including Timeline, News Feed, and Groups—as well as *additional* revenue from allegedly convoyed features, such as Photo/Video Sharing, that he claimed are "inextricably linked" to Timeline and News Feed.[3]  *See* ADD0056; ADD0178; ADD0184; ADD0387–88.

To accomplish his top-down calculation, Malackowski began with Facebook's total revenues during the alleged period of infringement, which he discounted in an attempt to exclude non-infringing mobile applications.  ADD0058; ADD0166–67; ADD0410.  Next, Malackowski relied on surveys conducted by Rembrandt's experts that asked respondents to rank the relative "importance" of certain features of Facebook's website—but not the accused BigPipe or Audience Symbol add-ons.  ADD0180–83.  Using the survey scores as a "proxy" for advertising revenue from the allegedly infringing and convoyed features, ADD0183, Malackowski concluded that over 65% of Facebook's total revenue should be included in the royalty base.  ADD0058; ADD0187; ADD0389; ADD0403.

---

[3]  Components are convoyed if they "together were considered to be components of a single assembly or parts of a complete machine, or they together constituted a functional unit."  *Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008) (internal quotation marks omitted).  Other supposedly convoyed features for which Rembrandt seeks royalties include the Facebook features known as "Like," "Share," "Comment," "Add Photos/Video," "Photo Tagging," "Find Friends," and "Friend Request."  ADD0387.

CONFIDENTIAL INFORMATION OMITTED

Next, based on a comparison with licenses of supposedly similar technology, Malackowski proposed a range of 2.3% to 21.99% for a hypothetical royalty rate. ADD0058; ADD0233; ADD0390.  Malackowski then purported to apply the factors for determining a reasonable royalty set forth in *Georgia-Pacific v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), again assuming that revenues from features of Facebook that are not themselves alleged to infringe apart from the BigPipe and Audience Symbol add-ons provide the relevant basis for damages.  *See* ADD0216–27.  He concluded that a reasonable royalty rate is 5–6%. ADD0058; ADD0234; ADD0390; ADD0406 & n.79.

Finally, multiplying his estimated royalty rate and his estimated royalty base, Malackowski arrived at what he asserted is a "reasonable royalty" of ███ ███. ADD0059; ADD0136; ADD0242; ADD406.

## C.    The District Court's *Daubert* Ruling And Certification Order

The district court excluded Malackowski's opinions under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), on two independent grounds.  First, the court found Malackoswki's opinions unreliable and prejudicial because they failed to apportion damages to Facebook's revenue from BigPipe and Audience Symbol, the improvements that Rembrandt claims give rise to the infringement.  ADD0061–65.  As the court found:

> [A]llowing Rembrandt's expert to use as the royalty base the entire
> value of Timeline, News Feed, Groups, and Photo/Video Sharing—all

6

of which can be used independently without infringing—while not using the value of BigPipe and Audience Symbol—the features that actually cause the alleged infringement—would be a mistake of the same kind as allowing Rembrandt's expert to use the entire value of Facebook.

ADD0063.   This error also infected Malackowski's calculation of a royalty rate, the district court found, because he improperly assumed that Facebook would have paid royalties to use features (like Timeline and News Feed) that it had used before 2009—and continues to use in mobile applications—without infringing.   *See* ADD0064 ("If Facebook did not pay Rembrandt to license the patents, it could have continued to use those four features without infringing."); *see also* ADD0064–65 (finding that calculation of royalty rate was unreliable).

Second, the district court excluded Malackowski's opinion because it employed a "suspect and unreliable" methodology that assumed, without analysis, that the results of surveys ranking the "importance" of various Facebook features were a reliable proxy for Facebook's revenue from those features.   ADD0065–66.

The district court declined to exclude Malackowski's opinion on several other grounds.   As relevant here, the district court disagreed with Facebook's argument that Malackowski's opinion violated the EMVR by basing damages on total revenue from Facebook features that do not independently infringe—including Timeline, News Feed, Groups, and the supposed convoyed features—without showing that the infringing components drive advertising demand for those fea-

tures.  In the court's view, because Malackowski had performed "two separate ap-portionments" to Facebook's total revenue stream, "the EMVR is not implicated here."  ADD0061.

At a pretrial hearing, the parties and the district court agreed that the *Daubert* ruling should be certified for interlocutory appeal under 28 U.S.C. § 1292(b). ADD0113; ADD0118–19; ADD0123.  The district court therefore certified "the question of the admissibility of plaintiff's expert report and related testimony on damages" and stayed the case pending this Court's resolution of the issue. ADD0048.

## ARGUMENT

This Court should grant the petition for permission to appeal.  *See Air Measurement Techs., Inc. v. Akin Gump Strauss Hauer & Feld, L.L.P.*, 206 F. App'x 980, 981 (Fed. Cir. 2006) (unpublished) (exercising discretion to allow appeal).

## A.    The Appeal Satisfies The Standards For Certification Under 28 U.S.C. § 1292(b) And Should Be Heard By This Court.

The district court's *Daubert* order is a textbook example of a ruling that satisfies the requirements of § 1292(b).  As the district court repeatedly noted, Rembrandt's entire theory of damages rests on the excluded Malackowski opinion:  "It is their sole basis for damages on the basis of reasonable royalty infringement, and that's a controlling question of law."  ADD0123.  In its *Daubert* ruling, for example, the district court found that "Rembrandt's claim for damages in this case *rests*

8

*entirely* on the report of its expert, James E. Malackowski." ADD0057 (emphasis added). The district court reiterated this point in its certification order, noting that "[p]laintiff's theory of damages in this case *rests solely* on this expert's report regarding a reasonable royalty." ADD0047 (emphasis added); *accord* ADD0110 ("the plaintiff put its eggs into that basket, and that's a basket proven to be faulty").

Rembrandt suggests that the district court has "left open" whether Rembrandt will be permitted to put on any evidence of damages, Pet. 9, but the district court's *Daubert* and certification orders belie that possibility. The district court has repeatedly said that the *only* evidence supporting Rembrandt's damages theory is the Malackowski report, ADD0047; ADD0057, and that Rembrandt will not be allowed to present an alternative theory of damages at trial: "It is clear that allowing [Rembrandt] to craft new theories of damages for presentation at trial, which has long been scheduled to commence in less than two working days, would be manifestly unfair to [Facebook]." ADD0047; *see also* ADD0120 (noting the court's "very firm view" that Rembrandt will not have a "do-over opportunity").

This controlling question of admissibility is entirely a product of Rembrandt's choosing. At the *Daubert* hearing, the district court presaged that Rembrandt's damages theory was in trouble—yet Rembrandt's attorney insisted that Rembrandt was committed to the damages theory espoused by Malackowski:

> THE COURT: … I think you would have had your expert maybe do it differently if you had anticipated this, but he didn't.

9

ATTORNEY HILLMAN: In all honestly, your Honor, we wouldn't.

THE COURT: Well, good.  If I reach a result adverse to you, then you won't -- there won't be any recriminations.  You can be happy that you did it as you did it.

ADD0267.  As the district court correctly ruled, Rembrandt cannot now be heard to argue that it should be allowed a second bite at the apple.  Its damages case therefore stands or falls with Malackowski's opinion.

A ruling by this Court would have an "immediate impact on the course of the litigation" because, as a practical matter, it would determine whether this case can proceed or whether it must end.  *Fujitsu Ltd. v. Tellabs, Inc.*, Misc. No. 154, 2013 WL 5098993, at *1 (Fed. Cir. Sept. 11, 2013) (per curiam).[4]  With no viable theory of damages, Rembrandt has no possibility of obtaining the money judgment it seeks.  Moreover, as a non-practicing entity that waited for years after the alleged infringement began before asserting the patents-in-suit, Rembrandt would not be entitled to an injunction even if it could somehow prevail on its infringement theories.  *See, e.g.*, *Pragmatus AV, LLC v. Facebook, Inc.*, No. 11-cv-494, 2011 WL 4635512, at *3 (N.D. Cal. Oct. 5, 2011) (observing that non-practicing

---

[4] In *Fujitsu*, the panel noted in a non-precedential opinion that "a question regarding the theory on which damages may be recovered cannot be controlling where the issue of liability remains undecided."  2013 WL 5098993, at *1.  Unlike *Fujitsu*, however, this case presents a question concerning the district court's exclusion of the only evidence supporting the sole theory on which Rembrandt, a non-practicing entity, is seeking damages.

10

patent licensor did not have "a plausible claim to an injunction"). This Court's affirmance of the district court's *Daubert* order would thus foreclose Rembrandt's ability to obtain the relief it seeks and effectively terminate the litigation.[5]

The district court has expressed its intention to proceed to trial if this Court declines to rule on the legal issue in this certified appeal. ADD0123 (noting that if this Court does not accept the appeal, "then we will proceed just as if it were right now"). The parties should not be forced to try this case on the slight chance that the *Daubert* ruling might later be reversed following final judgment. That issue is squarely presented for this Court to decide now, and an affirmance would effectively terminate this litigation. The efficiencies of this appeal could not be more clear, and present exactly the circumstances for which Congress enacted § 1292(b). *See, e.g.*, *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 754 (3d Cir. 1974) (en banc) (noting the aim of § 1292(b)'s drafters in avoiding "wasted protracted trial").

## B.    Rembrandt's Characterization Of The Legal Issues Is Inaccurate And Incomplete.

Despite being in agreement with Rembrandt on the need for interlocutory review of the *Daubert* ruling, Facebook wishes to correct several misimpressions

---

[5] The district court, to be sure, mused about the possibility of "some kind of remedy," ADD0110—namely, "nominal" damages, ADD0108—if Rembrandt obtained a judgment of infringement and its patents were not declared invalid (as Facebook contends they should be). *See Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*, 895 F.2d 1403, 1407 (Fed. Cir. 1990). But Rembrandt is not seeking nominal damages, and has not said it would try this case and risk a declaration of invalidity for the mere possibility of nominal damages.

11

in Rembrandt's portrayal of the relevant legal issues.

### 1.     Rembrandt Challenges Mere Exercises Of Discretion By The District Court That Are Amply Justified On This Record.

*a. Apportionment.* Rembrandt suggests that district courts are divided on the need to apportion damages beyond the "smallest salable patent-practicing unit." Pet. 13–15. Here, however, the district court correctly determined that Malackowski "failed to apportion Facebook's revenue to BigPipe and Audience Symbol—the *features actually causing the alleged infringement*." ADD0061 (emphasis added).

BigPipe and Audience Symbol are merely improvements added onto the preexisting—and non-infringing—Facebook platform. "'When a patent is for an improvement, and not for an entirely new machine or contrivance, the patentee must show in what particulars his improvement has added to the usefulness of the machine or contrivance.'" *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1337 (Fed. Cir. 2009) (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)). District courts must "carefully tie proof of damages to the claimed invention's footprint in the market place," *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (per curiam), assessed in light of the "economic relationship between the patented method and non-infringing alternative methods … [that] would limit the hypothetical negotiation," *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1312 (Fed. Cir. 2002).

12

Rembrandt argues that various Facebook web pages infringe the '316 and '362 patents by virtue of the "overall structure and delivery of the page itself." Pet. 3. It is undisputed, however, that the introduction of BigPipe and Audience Symbol in 2009 is what distinguishes the allegedly infringing versions of Facebook web pages from previously (and currently) existing versions of the same pages that do not infringe. To obtain "a reasonable royalty for the use made of the invention," 35 U.S.C. § 284, Rembrandt must therefore provide evidence of the *incremental value* that BigPipe and Audience Symbol have allegedly provided to Facebook. *See Garretson*, 111 U.S. at 121 ("The patentee … must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative …." (internal quotation marks omitted)); *Lucent Techs.*, 580 F.3d at 1337 (quoting same). Facebook, of course, would not have paid a royalty to use features and technologies that predate the alleged infringement.

Rembrandt's damages expert, in calculating both the royalty base and the royalty rate, made no effort to apportion revenue to the incremental contribution of BigPipe and Audience Symbol. Instead, he simply calculated a supposed reasonable royalty based on Facebook's entire revenue stream from four features that predate the asserted infringement and numerous additional features that are allegedly

convoyed.  ADD0178.  To be sure, Facebook currently delivers News Feed, Time-line, Groups, and Photo/Video Sharing through web-based platforms using Big-Pipe.  Yet, each of those features existed well before the use of BigPipe (and thus the alleged infringement) began in 2009, and there is no dispute that Facebook currently provides those features through mobile applications without infringing.  *See* ADD0250; ADD0310.  The introduction of BigPipe and Audience Symbol could not strip Facebook of its right to use its preexisting and fully-developed technologies or entitle Rembrandt to royalties on the value of those technologies.

Contrary to Rembrandt's suggestion, *see* Pet. 12–13, this Court's decision in *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012), does not preclude apportionment below the smallest salable patent-practicing unit.  *See id.* at 67.  Rather, further apportionment is required whenever necessary to satisfy the rule that "'if plaintiff's patent only created a part of the profits, he is only entitled to recover that part of the net gains.'"  *Lucent Techs.*, 580 F.3d at 1337 (quoting *Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*, 225 U.S. 604, 614–15 (1912)).  Because Rembrandt's damages expert erroneously apportioned revenue to preexisting features of Facebook, his claim that nearly two-thirds of Facebook's revenue is attributable to the patents-in-suit is unreliable and prejudicial.  The district court properly exercised its discretion in excluding Malackowski's tes-

14

timony as to his calculation of both a royalty base and a royalty rate.  ADD0064–65.

　　*b. Surveys.*  The district court correctly excluded Malackowski's opinion for the independent reason that it employs a "suspect and unreliable" methodology to calculate the royalty base.  ADD0065–66.  Specifically, Malackowski relied on the results of three surveys—two of Facebook users and one of advertisers—taken by other Rembrandt experts.  ADD0180.  Respondents were asked to rank the "relative importance" of 21 Facebook features as a percentage, *see* ADD0181–83, which Malackowski then averaged across the three surveys, ADD0187.  Malackowski then simply assumed that the weighted average is a "proxy" for the percentage of Facebook revenue that each feature generates.  *See* ADD0183 ("The weighted percentage of importance of any feature or group of features with respect to the whole set of features is a proxy for the percentage of demand for the whole set of features that is driven by the feature or group of features.").  In this way, Malackowski concluded that an outlandish "65.22% of demand for Facebook is driven by" the allegedly infringing features.  ADD0187.

　　As the district court noted, Malackowski offered no explanation why "the weighted importance of any given feature is exactly equal to the same percentage of advertising revenue."  ADD0065.  Indeed, Rembrandt's own survey expert, Jerry Wind, testified that the survey results could not be used in this manner without

performing "separate analysis" that neither he nor Malackowski ever performed. ADD0372–73 (cautioning that "the link between this [survey] data and the revenue question has to be the subject of a separate analysis").  There is no question that Rembrandt's experts did not perform this admittedly necessary separate analysis.

Expert testimony must be the product of "reliable principles and methods" to be admissible.  Fed. R. Evid. 702(c).  Because Malackowski's calculation of royalty base was "connected to existing data only by the *ipse dixit* of the expert," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), the district court did not abuse its discretion in excluding Malackowski's opinions as unreliable.

2. **There Are Substantial Grounds For Difference Of Opinion With Respect To The District Court's Rejection Of Facebook's EMVR Argument.**

Separate and apart from the arguments advanced by Rembrandt, the district court incorrectly resolved an important legal question on which there is a substantial ground for difference of opinion:  Whether the EMVR applies when a patentee seeks damages based on the entire revenue stream attributed to a particular combination of functions but asserts infringement only as to a subset of those functions.  The district court held that the EMVR does not apply in such circumstances, a holding that Facebook contends is legal error.  *See Lucent Techs.*, 580 F.3d at 1336 (misapplication of the EMVR constitutes "legal error").

The only accused infringing technologies in this case are the functionalities

16

introduced by BigPipe and Audience Symbol. Their implementation in 2009 marks the beginning of Facebook's alleged infringement; it is undisputed that Facebook did not infringe prior to the introduction of BigPipe and Audience Symbol. *See* ADD0056; ADD0064; ADD0311–12; ADD0315–17; ADD0320–23; ADD0330–31; ADD0361. Both technologies are minor add-ons to various Facebook features, such as News Feed and Timeline, that do not infringe when used independently of BigPipe and Audience Symbol. *See* ADD0062 (noting that "the accused technologies represent a small improvement to an existing technology"). Yet, Malackowski, Rembrandt's sole damages expert, based his damages estimate on the *entire market value* of Facebook's advertising revenue from these Facebook features as well as numerous "convoyed" features—necessarily including the revenue associated with the many non-infringing functionalities associated with those features other than BigPipe and Audience Symbol.

This Court has repeatedly held that the EMVR applies (as here) whenever a patentee seeks damages for an accused infringer's use of a set of multiple components, only part of which is allegedly infringing, based on the total revenues associated with those components. *See LaserDynamics*, 694 F.3d at 67; *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011); *Lucent Techs.*, 580 F.3d at 1336–37. In such circumstances, "the patentee must prove that 'the patent-related feature is the basis for customer demand.'" *Lucent Techs.*, 580 F.3d at

17

1336 (quoting *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995) (en banc)); *accord TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986) ("The [EMVR] allows for the recovery of damages based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for customer demand."). This rule implements the longstanding principle that a patentee may not obtain royalties based on sales of an entire product when those sales are not "properly and legally attributable to the patented feature." *Garretson*, 111 U.S. at 121 (internal quotation marks omitted).

The district court held that the EMVR "is not implicated" here because Malackowski "did not use the entire value of Facebook as the royalty base." ADD0061. The court believed that Malackowski avoided the EMVR by using as his revenue base the revenues allegedly produced by a subset of Facebook's features—namely, News Feed, Timeline, Groups, Photo/Video Sharing, and the numerous other supposedly convoyed features. *See* ADD0061; *see also* ADD0058 (describing the two separate apportionments of Facebook's total revenue stream).

The district court's EMVR holding fundamentally misconceives the logic of the EMVR doctrine, which applies equally whether a patentee bases damages on revenues attributable to an entire multi-component product (only some components of which are alleged to infringe), or revenues attributable to certain features of a product (only some aspects of which are alleged to infringe). Rembrandt seeks a

18

royalty based on the total revenue stream from certain *features* of Facebook that existed successfully prior to any alleged infringement and continue to be provided successfully to mobile application users without infringing.  Only certain *aspects* of those features are alleged to cause the infringement.  But Rembrandt has not even attempted to show that those aspects—BigPipe and Audience Symbol—drive advertising demand for the non-infringing features.  Applying the logic of the EMVR, Rembrandt therefore cannot, as a matter of law, seek damages based on Facebook's entire advertising revenue stream from News Feed, Timeline, Groups, Photo/Video Sharing and the allegedly convoyed features.

Although this Court has not applied the EMVR in precisely this context, the logic of its decisions is fully applicable here.  As the district court itself noted in discussing Malackowski's errors in apportionment, allowing Malackowski to calculate damages based on total revenue from non-infringing *features* of Facebook is "a mistake of the same kind as allowing Rembrandt's expert to use the entire value of Facebook."  ADD0063.  It therefore should not matter, for purposes of the EMVR, whether Rembrandt bases its damages calculation on the entire value of Facebook or instead on what it asserts to be the entire value of the Facebook *features* that are not alleged to infringe absent BigPipe and Audience Symbol.  In both instances, Rembrandt is seeking damages "far in excess of the contribution of the claimed invention to [the] market," *Cornell Univ. v. Hewlett-Packard Co.*, 609 F.

19

Supp. 2d 279, 283–84 (N.D.N.Y. 2009), and the EMVR precludes such relief.[6]

This case presents an excellent vehicle to address this critically important question at this time, given the absence of competing issues that could complicate a post-judgment appeal. Software often operates as a component of a larger suite of features that in turn comprise even larger products, like Facebook or other complex multi-feature offerings. *See Lucent Techs.*, 580 F.3d at 1332. Patentees seeking damages based on alleged infringement caused by particular software add-ons must prove that the particular add-ons drive demand for the entire product; otherwise, damages must be apportioned only to the allegedly infringing add-ons themselves. Allowing the district court's contrary reasoning to stand would sow confusion, undermine the logic of the EMVR, and create a gaping exception for overreaching patentees to exploit in countless cases involving software and internet patents. This Court should allow this appeal and clarify that the EMVR applies in the software context no less than in other contexts.

## CONCLUSION

For the foregoing reasons, Rembrandt's petition should be granted.

---

[6] Royalty calculations for small components that start with billion-dollar revenues, such as Facebook's advertising revenue, "skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue." *Uniloc*, 632 F.3d at 1320. Such large revenue numbers, divorced from consumer demand, "only serve to make a patentee's proffered damages amount appear modest by comparison, and to artificially inflate the jury's damages calculation beyond that which is adequate to compensate for the infringement." *LaserDynamics*, 694 F.3d at 68 (internal quotation marks omitted).

Respectfully submitted,

Dated: December 26, 2013

/s/ *Thomas G. Hungar*

| | |
|---|---|
| Heidi L. Keefe | Thomas G. Hungar |
| Mark R. Weinstein | *Principal Attorney* |
| COOLEY LLP | Lucas C. Townsend |
| 3175 Hanover Street | GIBSON, DUNN & CRUTCHER LLP |
| Palo Alto, CA  94304 | 1050 Connecticut Avenue, N.W. |
| | Washington, DC  20036 |
| Michael G. Rhodes | Tel:  (202) 955-8500 |
| COOLEY LLP | Fax:  (202) 467-0539 |
| 101 California Street, 5th Floor | |
| San Francisco, CA  94111 | |

*Attorneys for Defendant-Respondent Facebook, Inc.*

21

# ADDENDUM

*Numbering begins with ADD0244.*

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

REMBRANDT SOCIAL MEDIA, LP,          )
                                     )
                        Plaintiff,   )
v.                                   ) CIVIL ACTION
                                     )
FACEBOOK, INCORPORATED, et al.,      ) 1:13-cv-158
                                     )
                        Defendant.   )
_____)

REPORTER'S TRANSCRIPT

<u>MOTIONS HEARING</u>

<u>Friday, October 11, 2013</u>


<u>BEFORE</u>:       THE HONORABLE T.S. ELLIS, III
                Presiding

<u>APPEARANCES</u>:  ROBERT HILLMAN, ESQ.
                DANIEL GOPENKO, ESQ.
                Fish & Richardson PC
                1425 K St., NW, Suite 1100
                Washington, DC 20005

                    For the Plaintiff

                HEIDI KEEFE, ESQ.
                ELIZABETH STAMESHKIN, Esq.
                Cooley, LLP
                Reston Town Center, 11951 Freedom Drive
                Reston, VA 20190-5656

                    For Defendant Facebook



                        ---


                MICHAEL A. RODRIQUEZ, RPR/CM/RMR
                    Official Court Reporter
                USDC, Eastern District of Virginia
                    Alexandria Division

1

APPEARANCES (Cont'd):

2

3

4                PHILLIP MORTON, ESQ.
                 Cooley, LLP
                 Reston Town Center, 11951 Freedom Drive
5                Reston, VA 20190-5656

6                    For Defendant

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              <u>INDEX</u>

2

3     RECAPITULATION AND QUESTIONS BY THE COURT              4

4
              (Court recessed)
5

6                              ---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  Civil Action No. 1:13-cv-158,

2    Rembrandt Social Media, LP versus Facebook, Inc., et al.

3          Will counsel please identify themselves for

4    the record.

5          THE COURT:  All right.  Who's here on behalf

6    of Rembrandt?

7          ATTORNEY GOPENKO:  Good morning, your Honor.

8          Daniel Gopenko from Fish and Richardson on

9    behalf of plaintiff.  With me today is Mr. Bob Hillman.

10          THE COURT:  All right.  And who will argue

11    today?

12          ATTORNEY GOPENKO:  Bob.

13          THE COURT:  I beg your pardon?

14          ATTORNEY GOPENKO:  Mr. Hillman.

15          THE COURT:  We don't use first names.

16          ATTORNEY GOPENKO:  I apologize.

17          THE COURT:  And for the defendant Facebook?

18          ATTORNEY MORTON:  Yes.  Good morning, your

19    Honor.

20          Phillip Morton on behalf of Facebook.  With

21    me Ms. Heidi Keefe and Ms. Elizabeth Stameshkin.  And

22    Ms. Keefe will be making the argument today.

23          THE COURT:  All right.  Thank you.

24          There are two motions to exclude today.

25    Ms. Keefe, I'll hear from you first with respect to the

1    first motion.  Let's take up, first of all, since they

2    really depend on one another, the motion about

3    Malackowski's damages.  You seek to exclude that on a

4    number of grounds.  And to some extent, that's pivotal

5    to the second one, isn't it?

6                ATTORNEY KEEFE:  I believe -- yes.  The

7    answer is yes, your Honor.

8                THE COURT:  All right.  Go ahead.

9                ATTORNEY KEEFE:  So, your Honor, I actually

10   have some slides that I passed up, but I prefer usually

11   just talking to your Honor unless you want me to go

12   through the --

13               THE COURT:  Well, I'll look at the slides.

14   I'm not -- all right.

15               ATTORNEY KEEFE:  What we really have here,

16   your Honor, is a dispute about the methodology used by

17   Rembrandt's damages expert, Mr. Malackowski.  Here, as

18   your Honor is aware from the last handful of times that

19   we've been in front of you, the claims of the patent --

20               THE COURT:  Just a handful?

21               ATTORNEY KEEFE:  I thought you enjoyed us

22   being here, your Honor.

23               THE COURT:  I -- let's go on.

24               ATTORNEY KEEFE:  Thank you, your Honor.

25               THE COURT:  Make your assumptions.

1          ATTORNEY KEEFE:  Thank you, your Honor.

2          So what we have here is a case regarding a

3  patent about sending down information from a server to a

4  user computer so that it can be combined somewhere in a

5  diary program or a diary applet so that it can

6  eventually be displayed to a user.

7          In this case, Rembrandt has accused Facebook

8  technology of infringing its patents.  The Facebook

9  technology that is at issue is the News Feed and/or

10  Timeline, some other types of display technology.  I

11  think groups and photos are also accused.  But only when

12  they're delivered through BigPipe.  BigPipe is what we

13  talked about a couple of weeks ago.  It's the program

14  that sits between the Facebook server and the user's

15  browser.

16          Now, in this case, News Feed and Timeline

17  long predated the BigPipe technology.  So Facebook

18  launched in 2004.  In 2004 when Facebook launched,

19  Facebook had a profiles section.  And in the profiles

20  section, you could actually see what the user -- who

21  they were and some of the things that they'd done on

22  their page, and other people could come and look at

23  that.  That technology's existed since Facebook's launch

24  in 2004.

25          In 2006, Facebook launched a feature called

1    News Feed.  News Feed essentially is a feature whereby

2    the Facebook servers determine what activity of your

3    friends, of your colleagues might be interesting to you,

4    and they present it to you so that you can kind of see

5    what's been going on with all of your friends or your

6    family.  That functionality has been in existence since

7    2006.

8            Nothing in this case is accused of

9    infringement until 2009 when BigPipe was added in order

10   to display the already existing technologies of News

11   Feed, Timeline, the wall, groups, photos, et cetera.

12           So what we have here is a crystal clear case

13   of a patent which is basically improving on existing

14   technology.  So News Feed, which predated the 2009

15   introduction of BigPipe, is only accused of infringing

16   the patent if it's delivered using the BigPipe

17   technology.

18           Rembrandt's expert is absolutely clear that

19   there can be no infringement without the use of BigPipe.

20   In fact, Facebook still displays News Feed and Timeline,

21   photos, groups not using BigPipe, on its native mobile

22   applications.  And those aren't being accused either.

23           So what we have here is an improvement

24   patent, News Feed delivered through BigPipe.  Therefore,

25   according to Federal Circuit precedent, damages must be

1    related to the patented contribution, not to unpatented

2    features, not to unpatented pieces of technology that

3    predated the infringing -- the allegedly infringing

4    technology.

5            However, Mr. Malackowski's entire report

6    looks to the value of News Feed, to the value of

7    Timeline to Facebook, not to the value of BigPipe in

8    delivering News Feed or Timeline.

9            So the fundamental disconnect we have here

10   is the methodology applied by Mr. Malackowski.  He is

11   not looking to what is the actual contribution of the

12   patented -- allegedly patented invention and valuing

13   that for his damages analysis.  Instead, he looks solely

14   to the notion of News Feed and/or Timeline, find some

15   value attributed to that, and then applies the entire

16   market value rule to the News Feed or Timeline feature

17   and says that that's the basis for his damages analysis.

18           We have other problems with the way he then

19   applies his damage analysis and not showing all of his

20   homework in terms of the *Georgia-Pacific* factors, et

21   cetera.  But the fundamental flaw, the one that cannot

22   be overcome in methodology, is that he did not use the

23   right technology inside of Facebook.

24           THE COURT:  Your pages -- go back to the

25   previous page you showed.

1          ATTORNEY KEEFE:  The Timeline?

2          THE COURT:  No.  I see.  Here it is.  It was

3     Page 13.

4          ATTORNEY KEEFE:  Yes, your Honor.

5          THE COURT:  What does that slide show?

6          ATTORNEY KEEFE:  This slide shows all of the

7     features that Mr. Malackowski looked at on Facebook in

8     order to try to determine how much damage Facebook would

9     owe Rembrandt if there was infringement.  But nowhere in

10    this list, nowhere in this list, are BigPipe or audience

11    symbols, which are the necessary elements that were

12    added in 2009 to preexisting technologies in order to

13    round out the infringement scenario.

14          Without BigPipe and audience symbols, there

15    can be no infringement.  It's undisputed that those

16    weren't added until 2009.  It's similarly undisputed

17    that the remainder of these features can't function

18    without BigPipe and audience symbols and, in fact, are

19    not accused independently of infringement.

20          So these are other features that Rembrandt

21    looks at.  Rembrandt also then tries to say that these

22    features need to be convoyed into the damage analysis

23    because they work with BigPipe or they work with the

24    audience symbols.  But the truth again here is that all

25    of these features can and do work without BigPipe and

1    audience symbols, as testified to by their own technical

2    expert, Dr. Golbeck.

3            So this list here are all of the other

4    things that their expert actually did analyze.  But

5    again, what's missing, what's critical, where the flaw

6    is in the methodology is that the contributions of the

7    patent, BigPipe and audience symbols, are no part of

8    this chart.

9            THE COURT:  All right.  You want to address

10    briefly the problems with the royalty rate?

11            ATTORNEY KEEFE:  Absolutely, your Honor.

12            So the problem with the royal rate,

13    assuming -- even if we assume that you could look to

14    News Feed as opposed to the smallest infringing piece or

15    the actual contribution, which is the Bigpipe and

16    audience symbol, the rate itself has problems.

17            The first problem with the rate is that

18    Mr. Malackowski used noncomparable licenses as the basis

19    for starting to figure out what his royalty rate was.

20    Long before the patents actually issued, there was a

21    product called zPad.  The product, which was put out by

22    Aduna and licensed to Hink Sport and to a university in

23    the Netherlands was actually a license to an entire

24    product.

25            So basically what those people received when

1    they paid 44 cents or one guilder per person was they

2    received absolute use of an entire product as well as

3    server storage space, functionality, the ability to talk

4    to people to make sure the thing was running -- up and

5    running and working.  It was not a naked patent license.

6         So right away, it's a noncomparable license.

7    It's not economically comparable because it's not for

8    the same thing.  It's not for a naked patent.  It's for

9    a product.

10         THE COURT:  He reduced it to 80 percent,

11    though, didn't he?

12         ATTORNEY KEEFE:  He reduces it to

13    80 percent, but what he says he did in order to reduce

14    it was he looks to other naked patent licenses that are

15    completely uncomparable in terms of technology or scope

16    or anything else.

17         He also does no homework in explaining how

18    he goes from those product licenses down to the naked

19    patent license.  He doesn't say, "And these are the

20    elements that I took out because all that's left in the

21    patent is this one feature," and that's what the naked

22    patent license would have been for.

23         The analysis isn't complete.  He uses a

24    noncomparable license to a product, and then tries to

25    right-size it or reduce it using noncomparable licenses

1    from the time period.  So what you end up with is

2    compounded problems.  Instead of fixing the problem, he

3    actually makes it worse because we don't even really

4    know what the license was that was used to downsize it

5    or right-size to 80 percent.

6            So right away those licenses are improper

7    and improperly utilized.  The royalty rate itself is

8    then also -- we have a large problem with the way the

9    rate is attained.  Because as he goes through the

10   *Georgia-Pacific* factors, almost exactly like the Court

11   found in the *ePlus* case, we have a listing of

12   *Georgia-Pacific* factors with simple notations at the

13   bottom of, "This may have made it higher, "This may have

14   made it lower" to go from a number in the low single

15   digits of 1 to 3 percent to suddenly bump it up to 5 to

16   6 percent with no explanation of how or why each of

17   those raisings or lowerings were actually tied to any of

18   the *Georgia-Pacific* analysis.  So what the *ePlus* case

19   tells us is you don't have to --

20           THE COURT:  That quote from *ePlus*, am I

21   supposed to recognize that?

22           ATTORNEY KEEFE:  Are you supposed to

23   recognize *ePlus* or the quote itself?

24           THE COURT:  The quote.

25           ATTORNEY KEEFE:  The quote itself, let me

1     see which page --

2                    THE COURT:  The question I am asking is can

3     you remind me whether that was an opinion I wrote.

4                    ATTORNEY KEEFE:  It was not.  It was Judge

5     Payne, your Honor.

6                    THE COURT:  All right.  Go on.

7                    ATTORNEY KEEFE:  It was Judge Payne.  This

8     was a Judge Payne decision in which he found that it

9     wasn't good enough for the expert to simply say, during

10    the *Georgia-Pacific* analysis, "I've looked at this, and

11    I think it goes up.  I've looked at this other factor,

12    and I think it goes down" without explaining in some

13    fashion how --

14                   THE COURT:  What does *Joiner* say about that

15    issue?

16                   ATTORNEY KEEFE:  It actually --

17                   THE COURT:  Is that quote from *Joiner* or

18    is -- is the whole quote from *Joiner* or is it just part

19    of it?  You have quoting *General Electric against*

20    *Joiner*.

21                   ATTORNEY KEEFE:  That particular quote --

22    the one that's on Page 20, that particular quote is from

23    *Joiner*.  And what *Joiner* is saying is that ipse dixit of

24    an expert, in other words, the expert is simply saying

25    that it's so without more, without showing your work, is

1    not enough.

2          With the *ePlus* case -- and it did quote --

3    it did use that quote from *Joiner* -- the remainder of

4    the *ePlus* case, the facts there were there had been a

5    number of licenses that the Court found to be

6    noncomparable that were utilized.  And then after that,

7    in the *Georgia-Pacific* analysis in *ePlus*, there was, I

8    think, 1 to 3 percent that would have been taken from

9    the licenses.

10          Then after going through the *Georgia-Pacific*

11   factors, the expert in the *ePlus* case said, "Well, I

12   would take Factor 2 and 4 and 6 and it would be neutral.

13   But with Factors 10 and 13 it would rise, and with the

14   others it would lower," but didn't say how or why and,

15   therefore, never kind of showed its homework and then

16   just ended up with a number of 5 to 6 percent as being

17   his final opinion.

18          That's very similar to what Mr. Malackowski

19   did here.  Mr. Malackowski lists the *Georgia-Pacific*

20   factors, but then just says, "Well, I've looked at this

21   factor and I think it might raise the number.  I've

22   looked at these other factors.  It might lower the

23   number," but then doesn't tie the raising or the

24   lowering to anything.  He just concludes at the end of

25   that analysis saying, "And based on all that, I find

 1    that the rate would be 5 to 6 percent."

 2              And so we have a very similar situation

 3    to eSoft -- I'm sorry -- to *ePlus* here where

 4    Mr. Malackowski just didn't do the homework and set it

 5    out for us to understand what the analysis was.  And

 6    that's why the quote is there about ipse dixit of an

 7    expert.  Because unless the expert actually shows their

 8    homework so that we understand what the analysis is to

 9    rely on it per *Daubert*, if that homework is not shown,

10    it can't be reasonably relied upon as being reliable.

11              THE COURT:  All right.  Thank you.

12              ATTORNEY KEEFE:  Thank you, your Honor.

13              THE COURT:  Mr. Hillman.

14              ATTORNEY HILLMAN:  Excuse me.  Thank you,

15    your Honor.

16              I, too, have a slide show here.

17              THE COURT:  All right.

18              ATTORNEY HILLMAN:  We'll set it up, but it's

19    sort of a full statement of our case.  And I will just,

20    in the interest of time, jump to basically the two

21    points that Ms. Keefe dealt with.  We can look at the

22    rest of it if you want or we'll just leave it with you.

23              THE COURT:  All right.

24              ATTORNEY HILLMAN:  But dealing first with

25    the -- the issue of should we have been looking at

1    BigPipe and this audience symbol on the privacy level as

2    the whole focus of the analysis or should we have been

3    looking at things like Timeline and News Feed.

4         I think the law is clear that it's Timeline

5    and News Feed and the other infringing elements of

6    Facebook that are relevant because they are the features

7    that infringe the claims.

8         THE COURT:  That's not what your expert

9    said.  Your expert said that there wouldn't be

10   infringement without Timeline -- or without BigPipe and

11   the audience thing, and they've been using these other

12   things long before this.  You don't accuse it then.  So

13   it seems to me that you're changing your tune.

14        ATTORNEY HILLMAN:  Well, the thing is, your

15   Honor --

16        THE COURT:  Are you?

17        ATTORNEY HILLMAN:  No, I'm not, your Honor.

18        THE COURT:  Can you show me where there is

19   something in this record that says, "We accuse News Feed

20   and Timeline and video sharing as infringing features"?

21        ATTORNEY HILLMAN:  Absolutely, your Honor.

22        THE COURT:  Where?

23        ATTORNEY HILLMAN:  It's throughout the --

24        THE COURT:  Where?

25        ATTORNEY HILLMAN:  -- expert reports.

1        THE COURT:  Where?

2        ATTORNEY HILLMAN:  I don't think that's even

3   disputed.

4        THE COURT:  Yes, it is.  It absolutely is.

5        ATTORNEY HILLMAN:  What we did not do --

6   here's the story, your Honor:  We agree that prior to

7   the introduction of BigPipe and the audience symbol, the

8   earlier versions of Timeline and News Feed did not

9   infringe.  No question about that.

10        THE COURT:  Because News Feed and Timeline

11   and video sharing, video storage don't infringe.

12        ATTORNEY HILLMAN:  In their earlier

13   versions, your Honor.

14        THE COURT:  The only thing that makes them

15   infringe is BigPipe.

16        ATTORNEY HILLMAN:  What BigPipe did was to

17   fundamentally change the way in which Timeline was

18   delivered.

19        THE COURT:  By one second.

20        ATTORNEY HILLMAN:  Well, that feature, your

21   Honor, is referred to by --

22        THE COURT:  And your expert didn't even

23   assess what significance that one feature would have to

24   the rest.

25        ATTORNEY HILLMAN:  Actually, I think he did,

1    your Honor.

2              THE COURT:  Really?

3              ATTORNEY HILLMAN:  Yes.

4              THE COURT:  He did a survey where he didn't

5    even ask the individual surveyed about that feature.

6              ATTORNEY HILLMAN:  But that feature is just

7    an element of other features.  It's not by itself a

8    feature.  It doesn't infringe by itself.  And the law is

9    clear that, you know -- there are two issues here, your

10   Honor:  The first is the apportionment of the total

11   revenue down to the features that infringe.  And the law

12   is clear that there is no requirement to reduce -- to

13   continue the apportionment down to things that by

14   themselves are not infringing.

15             THE COURT:  What case do you cite from the

16   Federal Circuit that you think is most apposite to that

17   point?

18             ATTORNEY HILLMAN:  Okay.  It's -- it's right

19   in here.  Let me just jump to that.  Excuse me while I

20   jump into here.  So here we are on Slide --

21             THE COURT:  This's what you just said.  That

22   doesn't give me any Federal Circuit case that says that.

23             ATTORNEY HILLMAN:  I'm in my wind-up, your

24   Honor.

25             THE COURT:  Let's pitch.  Never mind the

1    wind-up.  Pitch.

2              ATTORNEY HILLMAN:  Here's the pitch.  It's

3    on Slide 15.  "The patentee must in every case give

4    evidence tending to separate or apportion the profits

5    between the patented feature and the unpatented

6    features."

7              THE COURT:  All right.  That's something

8    that Ms. Keefe says absolutely.  That's why she's here.

9              MR. HILLMAN:  Right.  But the patented

10   feature, your Honor, is Timeline once BigPipe was

11   introduced --

12             THE COURT:  Well, that's the debate between

13   you two.  You say that's the patented feature; she says

14   that the record indicates the contrary.  So that's the

15   decision I have to make.

16             ATTORNEY HILLMAN:  That's right, your Honor.

17             THE COURT:  All right.  I'm ready to make

18   it.

19             ATTORNEY HILLMAN:  Well, could I finish a

20   little more on this?

21             THE COURT:  Yes.  I didn't say I'm ready to

22   make it one way or the other, but I'm certainly ready to

23   make it.  I've heard a good deal about it.

24             ATTORNEY HILLMAN:  Here's my next case:

25   Let's look down at *Laser Dynamics* again on Page 15.  "It

1    is generally required that the royalties be based not on

2    the entire product, but instead on the smallest saleable

3    patent practicing unit."

4              Now, BigPipe by itself is not a patent

5    practicing unit.  It's only an element of Timeline -- of

6    the new version of Timeline and News Feed, which are the

7    patent practicing unit.

8              THE COURT:  The only thing new about

9    Timeline and News Feed is BigPipe.  It's the delivery of

10   it.

11             ATTORNEY HILLMAN:  Well, let's take a look

12   at --

13             THE COURT:  Is that right or wrong?

14             ATTORNEY HILLMAN:  It's not a situation --

15             THE COURT:  Is that right or wrong?  You

16   have to answer my question.

17             ATTORNEY HILLMAN:  I would say --

18             THE COURT:  Otherwise, we're -- it's futile

19   for me to sit here.

20             ATTORNEY HILLMAN:  I would say it's not

21   right, your Honor.

22             THE COURT:  Why not?

23             ATTORNEY HILLMAN:  Because it's not a

24   situation where you had an existing thing, and then you

25   just added an element to it and left the rest of it --

1        THE COURT:  It did have News Feed and

2   Timeline before.

3        ATTORNEY HILLMAN:  Right.  But what

4   happened -- if you take a look at the claims of the

5   patent and apply them to News Feed, you see that none of

6   the elements that were in the old Timeline are any

7   longer present.  The whole operation of News Feed, one

8   element of which is BigPipe, is the elements of the

9   claim.  And I've got a slide here that makes that point.

10  It's Slide 11.  We're going backward here.

11        So here's what Timeline looked like after --

12  starting in 2009.  And none of this operation is the

13  same as it was in the old Timeline.  So let's take step

14  by step.  At the top here, the diary server is sending

15  the diary program, which includes BigPipe, down to the

16  user system.  So that feature was new.

17        The second step, three different things are

18  sent down to BigPipe:  The content data, the page

19  design, and privacy level information.  None of that

20  happened in the old Timeline.  What happened in the old

21  Timeline is that the whole thing was set up at the

22  server and simply sent down.  There was no sending

23  individually of content, of page design, and the privacy

24  level information.

25        And then the assembly step.  There was

1    nothing to assemble in the old Timeline.  So that's a

2    brand-new step.  Then the last two here are the steps

3    taken to update or to change the content or the design,

4    and none of that was true, also.

5           Composer, which you'll remember from the

6    last hearing is also part of the diary program even

7    though it wasn't relevant to the summary judgment

8    discussion.  That sends a request back to the server,

9    and then in the final step the server sends new stuff

10   down.

11          So all of that is new, and that's the new

12   Timeline.  Now, it's true that that didn't happen until

13   BigPipe was introduced and until the audience symbol was

14   introduced.  But those two steps together are now

15   fundamental to the new version of Timeline and the new

16   version of News Feed.

17          And so then the question is, well, how

18   important are these?  Are these just trivial little

19   things?  Well, we'd say that Malackowski did consider

20   the value of BigPipe and audience symbol in Slide 17.

21   And, you know, we've got a bunch of quotes here

22   explaining where he did it, how the speed was

23   introduced -- was increased with the BigPipe technology.

24   And the transparently -- transparency and intuitiveness

25   of the privacy settings were improved with the audience

1    symbols.

2              And he cited in his report -- this is the

3    original report -- the support for that.  And this is --

4    these are some quotes from Facebook's own document that

5    cites speed as one of the most critical company goals

6    for Facebook.

7              "In 2009, we successfully made Facebook's

8    site twice as fast.  One of the secret weapons that we

9    use to do this is called BigPipe."  And then you've got

10   this graph in here.

11             So that was a big deal.  You can say, "Okay,

12   it's just a second."  But the reality is that the people

13   at Facebook thought it was a very big deal, that it was

14   a secret weapon.

15             And he, Malackowski, further cited and

16   relied on the Golbeck report as to the importance of

17   BigPipe and the audience symbol.  And, you know, here

18   we've have got some quotes from Golbeck that basically

19   were incorporated by Malackowski into his report.  So --

20             THE COURT:  How could this fellow think that

21   BigPipe was so important and then ignore it in his

22   rankings, ignore it in his survey.

23             ATTORNEY HILLMAN:  Because it's just an

24   element of the things he did.

25             THE COURT:  Well, that's what I have to

1    decide whether that makes a hill of beans or not.

2            ATTORNEY HILLMAN:  Right.

3            THE COURT:  I think what's happening is what

4    happens in a lot of cases.  I used to do it.  I used to

5    do what you're doing.  That is there's a litigation.

6    You plan, and then there are things that happen, and

7    then you have to adjust to it and you have to do things

8    to adjust to the situation raised by the other side.

9    And I have to decide whether that's really valid or not.

10    And that's -- you're pointing out I think you would have

11    had your expert maybe do it differently if you had

12    anticipated this, but he didn't.

13            ATTORNEY HILLMAN:  In all honestly, your

14    Honor, we wouldn't.

15            THE COURT:  Well, good.  If I reach a result

16    adverse to you, then you won't -- there won't be any

17    recriminations.  You can be happy that you did it as you

18    did it.

19            ATTORNEY HILLMAN:  Here's the thing, your

20    Honor:  Let's take BigPipe.  The average user -- the

21    user doesn't know whether BigPipe is there or not.  The

22    other side did these --

23            THE COURT:  It doesn't matter what the

24    user -- the user is interpreted in speed, but he only

25    gets a second, and that's not a big deal.

1          ATTORNEY HILLMAN:  Facebook says it is a big

2     deal.

3          THE COURT:  Well, all right.  Go on.

4          ATTORNEY HILLMAN:  Well, that's a disputed

5     fact, your Honor.  But --

6          THE COURT:  We're not talking about disputed

7     facts today.  We're talking about whether I think that

8     your expert's opinion is firmly based on reasonable

9     evidence and reliable, whether it's reliable.

10          ATTORNEY HILLMAN:  And our position, your

11     Honor, is that our expert had the right to rely on

12     Facebook's statements about the importance of BigPipe.

13     They called --

14          THE COURT:  He has a right to rely on

15     anything he wants to.  What matters is whether I think

16     that reliance is entitled to any deference at all.

17          ATTORNEY HILLMAN:  Well --

18          THE COURT:  If it's one second, then he

19     says, "Oh, but they say it's a big deal," he ought to

20     look at the substance, not some puffing statements.

21          ATTORNEY HILLMAN:  I would still submit,

22     your Honor, that whether this is a puffing statement or

23     whether it's substance is a matter that ought to be

24     decided at trial, not at this stage of the game.  Here

25     we've got --

1        THE COURT:  I'm deciding at this stage of

2   the game whether your expert's opinion is reliable in

3   its methodology.  I act as a gatekeeper.  This isn't a

4   jury issue.

5        Go ahead.  I'll listen further.

6        ATTORNEY HILLMAN:  Let me -- let me -- let

7   me go to the rate issue.

8        THE COURT:  All right.  Before you do that,

9   though, I want to be sure I understand your argument.

10       You say that -- Ms. Keefe says, "Look, the

11  Timeline and the video sharing and News Feed were not

12  accused features."  Your argument is that it's a new

13  situation when you add BigPipe and that they are now

14  accused.

15       Is that what you're saying.

16       ATTORNEY HILLMAN:  That's correct, your

17  Honor.  And they are the smallest possible infringing

18  feature or patent practicing feature, which is what --

19       THE COURT:  They have the what?  I'm sorry?

20       ATTORNEY HILLMAN:  News Feed and Timeline in

21  their new versions are the smallest patent practicing

22  units of the system.

23       THE COURT:  All right.

24       ATTORNEY HILLMAN:  And what we say -- and

25  that's why I read to you from *Unilock* and *Laser*

1    *Dynamics* -- is that the Federal Circuit requires that

2    you allocate down to the smallest patent practicing

3    unit.  There is no case that we know of that says that

4    you have to allocate for the purposes of setting the

5    base down below that into an element of the patent

6    practicing unit that is not itself an infringement or

7    patent practicing.  And that's our position on the law.

8             THE COURT:  Let me hear Ms. Keefe's response

9    to that, then you can come back and address royalty rate

10   in a few minutes.

11            ATTORNEY KEEFE:  Happy to, your Honor.

12            The first thing I take extreme exception

13   with is this isn't a new version of News Feed.  BigPipe

14   is a delivery mechanism.  News Feed hasn't changed.

15   This isn't a new version of News Feed.  This is News

16   Feed being delivered through BigPipe instead of not

17   through BigPipe.

18            News Feed is also not being accused as it

19   exists today when it's delivered to a native mobile

20   application.  So this isn't that there are now --

21            THE COURT:  What is your answer to his

22   argument that Federal Circuit precedent does not require

23   allocating down to the BigPipe level.

24            ATTORNEY KEEFE:  I disagree completely.  If

25   we look at, for example, the *Lucent* case, *Unilock*, *Shell*

1    *vs. Reilly*, in the *Lucent* case, what we had was the

2    Microsoft Outlook had a feature called datepicker.  Now,

3    datepicker didn't work all by itself.  Datepicker didn't

4    infringe alone.  It infringed as part of Microsoft

5    Outlook.  It was a feature whereby the system would pop

6    up a window where you could actually cut and past in the

7    dates that you wanted to choose out of the calendar.

8    The claims required you to be able to do this in a

9    larger system.

10           So just -- Mr. Hillman's arguing that

11   because BigPipe can't infringe all by itself, it has to

12   be with other things, that somehow means that we don't

13   go down to the smallest unit.

14           The Court in *Lucent* found that even though

15   datepicker itself may not have infringed alone or didn't

16   work alone, it had to be a part of Outlook, that you

17   couldn't use Outlook as the product that you were

18   evaluating in terms of value for the base.

19           Instead, they rejected the argument of using

20   all of Outlook and said, "You have to go down to whether

21   or not there is value in datepicker and whether or not

22   users would have bought Microsoft Office or Outlook just

23   for the datepicker function."  That's what we're saying

24   is happening here.

25           THE COURT:  Address the case, though, that

1    Mr. Hillman just mentioned where he says you don't have

2    to go down --

3            What was the term you used?

4            ATTORNEY HILLMAN:  Beyond the smallest

5    patent practicing unit.

6            THE COURT:  There you are.

7            And what was the name of the case,

8    Mr. Hillman?

9            ATTORNEY HILLMAN:  Well, it was *Laser*

10   *Dynamics*.

11           ATTORNEY KEEFE:  And in *Laser Dynamics*, the

12   exact type of thing happened that's happening here, your

13   Honor.  In *Laser Dynamics*, what we had was a case of an

14   optical disc drive being put into a larger laptop.  The

15   optical disc drive was -- it's the thing that popped out

16   of the side of your computer.  You put a CD or DVD into

17   it, shut it, and then the computer runs using that disc.

18           The patent in that case was about an

19   automatic feature whereby the laptop and the drive

20   itself would read to see whether or not the CD --

21   sorry -- the disc that had been put in was a DVD or a

22   CD.

23           In that case, the plaintiff had attempted to

24   say that they deserved royalties on the entire laptop

25   because it worked in conjunction with the laptop.  That

1   disc drive didn't work unless it was put into the

2   laptop.

3          So there was no only down to one piece that

4   was the tiniest little part that was infringing because

5   it was part of the sum total the same exact way that we

6   have here.  However, in that case, the Court rejected

7   the notion that the laptop be used as the royalty base

8   and instead said you had to go down to the actual

9   patented contribution.  And there the patented

10  contribution was this automated software being run on

11  just the optical disc drive, just like here.

12         We may have News Feed, but the only patented

13  contribution to it is a delivery through BigPipe.

14  Therefore, all of the case law says that you have to

15  look to the patented contribution, that smallest

16  saleable unit, whether or not it could be sold

17  independent or by itself.

18         The *Unilock* case, same idea.  In the *Unilock*

19  case, the plaintiff was trying to accuse Microsoft of

20  infringing by use of product activation, which was a

21  code that you had to type in before you could access the

22  Microsoft products like Windows or Office.  And the

23  plaintiff said that they deserved, therefore, a share of

24  every single thing that Microsoft had ever sold because

25  you couldn't even use the products without having

1    infringed the product activation claims.

2            What the Court said there was, "No, you

3    can't look to the whole thing.  You have to look to just

4    the patented contribution," which in that case was

5    product activation.  Product activation couldn't even be

6    used by itself.

7            So what the Court said, though, was, "It

8    doesn't matter.  That's the smallest contribution being

9    made by this patent."

10           And last but not least, we cited in our

11   brief the *Shell versus Reilly* case.  That's a case just

12   like here where you had a preexisting thing.  There they

13   were oil rigs, the same way that I would say News Feed

14   or Timeline preexisted.  In that case, the plaintiff

15   tried to get royalties and damages off of the entire oil

16   rig saying that unless they used their mud mat -- that

17   was the patented improvement there -- unless you use the

18   mud mat to put the rig into place -- the mud mats were

19   basically a way of making sure that the pylons that the

20   oil rig uses to go down into the ground were more

21   stable.

22           And the Court said, "No, you don't get to

23   look to the whole rig.  You have to look to the patented

24   contribution."  Even though when you put the mud mat in

25   with the rig, it all works together in one fashion.  And

1    the mud mats wouldn't work without the rig because they

2    have to be used in order to establish the rig.

3         So I disagree with Mr. Hillman's reading of

4    those cases to now say that you can't go down to the

5    BigPipe portion.  Instead, every case coming out of the

6    Federal Circuit right now is absolutely clear it's just

7    the opposite.  They're saying you don't look to the

8    whole product that's being accused.  You look to the

9    patented contribution.

10        THE COURT:  He doesn't dispute that.  It's

11   how far down you go, is what he disputes.

12        ATTORNEY KEEFE:  And what I'm saying here is

13   that you have to go down to the patented contribution.

14   And that is exactly what happened in *Lucent* when they

15   went down to the datepicker function.  It's what

16   happened in *Unilock* when they went down to product

17   activation function.  It's what happened in *Shell* when

18   they went down to the mud mats.

19        I could go on, but that's exactly why the

20   case law supports it.  We're saying you have to go down

21   to the patented contribution, which in this case is

22   BigPipe and/or the audience symbol.

23        THE COURT:  Mr. Hillman, you want to go on

24   to royalty now.

25        ATTORNEY HILLMAN:  Actually, I need to

1   respond to that because we have --

2           THE COURT:  She gets the last word on

3   anything that's said.  So -- and at some point, as a

4   concession to the shortness of life, we have to end it.

5   You've had briefs and everything.  But -- I do want you

6   to respond, but make it succinct.

7           ATTORNEY HILLMAN:  Very well.  I'll talk

8   about just one of those cases, *Laser Dynamics*.

9           THE COURT:  All right.

10           ATTORNEY HILLMAN:  And I think that case

11   proves my point.  The smallest patent practicing unit in

12   that case was the disc drive.  Now, the plaintiff there

13   improperly tried to claim royalties on the whole laptop.

14   And what the Court said was, "No, the most you can do is

15   on the disc drive itself."

16           But the interesting thing is that when you

17   looked into what the real technological contribution

18   was, it was only a little feature of the disc drive.  It

19   was the ability of the disc drive to detect what kind

20   of disc is being put in to be played.  That was the new

21   thing.

22           Disc drives themselves had existed a long

23   time by that point.  But the Court did not require the

24   allocation or the apportionment to go down to the value

25   of that one little feature.

1      THE COURT:  All right.

2      ATTORNEY HILLMAN:  It's clear from the

3  opinion that it was sufficient to get it down to the

4  disc drive as a whole because that was what infringed.

5  If you went beyond that, it didn't infringe.

6      THE COURT:  Let's give Ms. Keefe the last

7  word on that, and then we'll go on to give you an

8  opportunity to respond to her royalty argument, then

9  she'll have the last word on that.

10      Ms. Keefe.

11      ATTORNEY KEEFE:  In that case, your Honor,

12  if you look, the studies that were done in that case

13  were directed to the patented contribution, and then

14  used the disc drive itself.  Here there's been no study

15  of the patented contribution in one way, shape, or form.

16  There's nothing that Mr. Malackowski said anywhere in

17  his report about whether or not there's value in BigPipe

18  or audience symbol, and that's all throughout our

19  briefs.

20      THE COURT:  All right.  Now let's go to

21  royalty.

22      ATTORNEY HILLMAN:  Let's see.  Let me jump

23  in our slides to that slide.  I believe it's Slide 40.

24  Actually, let's -- I think we can just look at one slide

25  here, your Honor.  I can make my point in connection

1    with this.  That would be Slide 45.

2              And so this sort of graphically illustrates

3    the analysis that Mr. Malackowski went through.  First

4    of all, he took the Aduna licenses themselves that had

5    happened before the patent even issued, and they were

6    software licenses.  And technologically, they were, you

7    know, completely comparable because it was the exact

8    same system that now covered by the patent claims.

9              He recognized that economically, there was a

10   big difference.  They were software licenses, and the

11   hypothetical negotiation is a patent license.  And so he

12   undertook to make a conversion between the software

13   license and what would have been the patent license if

14   there had been a patent at that time.

15             And he used some publicly available

16   information about other kinds of software license

17   agreements to come up with a conversion factor of

18   20 percent or 80 percent, depending on which way you

19   look at it.  And he then converted that to what would

20   have been a royalty rate if it had been a patent

21   license.  And he used that as a lower end of this range.

22   That's the 2.3 percent on the slide.

23             And then he looked at the total profit

24   margin that was attributable after his apportionment to

25   the patented and convoyed features.  And he said, "Well,

1    that's the total amount of profit that needs to be split

2    in some way between the parties in the hypothetical

3    negotiation.  And he called that his upper bound, which

4    is the 21.99 percent.

5         And then he made other calculations.  He

6    looked at what would the profit have been on just the

7    Timeline, NewsFeed, and the other two directly

8    infringing features without the convoyed features.  And

9    that would have been 6.66 percent.

10        And then based on that and the

11   *Georgia-Pacific* factors, he came up with his 5 or

12   6 percent.  It's not something that he just pulled out

13   of the air.  But if you notice, it's very similar --

14   it's just a little bit below what the profit margin

15   would have been on just the directly infringing

16   features, the 6.66.  It's not unreasonable to say that

17   in a negotiation, the parties might well have

18   compromised, you know, in the middle there some slightly

19   below that 6.6 percent.

20        But beyond all that, he did something else.

21   In connection with the *Georgia-Pacific* factors, in

22   particular Factor 11, which is the value of the patented

23   technology, he concluded that that was very strong.  And

24   again, admittedly this gets into our debate about he's

25   entitled to rely on Timeline and News Feed in their new

1      form or not, but he even went beyond that.

2              He looked at a couple of other situations

3      outside of the context of the *Georgia-Pacific*.  He

4      looked at two transactions that Facebook had undertaken.

5      One of them was a settlement with a company called

6      Summit 6, which is a company that had improvement

7      technology on uploading photos into Timeline, and they

8      paid $20 million for that technology -- to settle that

9      patent case.

10              And Mr. Malackowski -- and this is -- I'm

11      talking about Pages 110 and 111 of his report.  He then

12      said, "Okay.  Well, that 20 million was just for a photo

13      feature where the features in this case were much more

14      pervasive of the system extending into Timeline and News

15      Feed, which Zuckerberg calls the pillars of the whole

16      Facebook system.  And so he scaled that up to a number

17      that, at a minimum, was 196 million.

18              And so he then looked at the acquisition of

19      Instagram, another company that had some technology

20      having to do with photos.  And in the publicly available

21      papers, Facebook assigns a value to that technology

22      itself of $74 million.  And so Mr. Malackowski undertook

23      a similar scale-up because that was just photos, and

24      this is more pervasive.  And he came up with something

25      over $700 million.

1          So we're not saying that those are the right

2    numbers, but those were sanity checks to show that based

3    on the facts of this case, it was not unreasonable for

4    him to come up with a number of 5 or 6 percent.  That's

5    totally different than what happened in the *ePlus* case.

6          THE COURT:  I don't think you really mean to

7    argue not unreasonable.

8          ATTORNEY HILLMAN:  No, I don't.  I'm being

9    too deferential here.

10          THE COURT:  The fact of the matter is --and

11    I might even point this out -- when you earlier said,

12    "Look, it's a jury issue about whether this is fast" or

13    whatever, this isn't a jury issue.  The whole point of

14    my sitting as a gatekeeper is to prevent things that are

15    unreliable and irrelevant from getting to a jury.

16    Because we all know that juries sometimes just accept

17    without any reflection what an expert says.

18          So it's very clear, under *Joiner* and *Daubert*

19    and all the cases, that district judges have to engage

20    the technology, and they have to decide whether the

21    methodology used is reliable.  It's certainly relevant

22    to consider what the reasonable royalty might be, but

23    then I have to consider whether it's a reliable

24    methodology.  Therefore, appeals to what a jury might

25    find is kind of out of place in *Daubert*.  And I wanted

1    to make that point.

2                 ATTORNEY HILLMAN:  I totally degree with

3    that, your Honor.  The one caveat I would offer, with

4    due respect, is that there's a fine line between

5    reliability and then a disputed point that, you know --

6                 THE COURT:  No one disputes that it's one

7    second.

8                 ATTORNEY HILLMAN:  Yes.

9                 THE COURT:  That's the fact.  Now, just

10   because they may hawk it as something blindingly fast

11   or, you know, it would improve it by a hundred percent

12   or something like that is not reliable.  What's reliable

13   is the fact that no one disputes it's one second.

14                 But let's get back to royalty because that's

15   what you're addressing now.  And I think what you

16   intended to argue is not that it's not unreasonable for

17   him to conclude that it was between 5 and 6 percent, but

18   that it's eminently reasonable for him to make that

19   conclusion given the predicates that he addressed.

20                 ATTORNEY HILLMAN:  That's correct, your

21   Honor.  I appreciate you correcting me on that.

22                 THE COURT:  If I degree with you, then the

23   matter simply goes forward.  If I don't agree with you

24   on any of these things, what happens?  Let's say I don't

25   agree with you with respect to, oh -- let's say I agree

1  with you on the point you made about going down to the

2  lowest patented unit, but I disagree with you on royalty

3  rate, what happens then?

4            I mean, the problem is that you don't get

5  to -- you don't get to redo all of your experts and go

6  back through discovery.  That would exclude the

7  testimony, wouldn't it, either one?

8            ATTORNEY HILLMAN:  I think courts have gone

9  both ways on that, your Honor.

10            THE COURT:  Well, all right.

11            All right.  Are you done with royalty?

12            ATTORNEY HILLMAN:  I am, your Honor.

13            THE COURT:  Ms. Keefe, royalty.

14            ATTORNEY KEEFE:  Thank you, your Honor.

15  Very briefly.

16            THE COURT:  Would you address this last

17  point I raised.  Let's suppose I agree with you on one

18  of these.  I don't have to reach even the other one, do

19  I?

20            ATTORNEY KEEFE:  That's correct, your Honor.

21  Once the testimony is excluded, one way or the other,

22  there's no testimony left to have.

23            THE COURT:  All right.  And then we would

24  take up Mr. Hillman's point that he thinks he should

25  then have a chance to repair it and to have new

1    discovery.

2              ATTORNEY KEEFE:  And I would argue deeply,

3    your Honor, that that simply shouldn't be the case.  We

4    have a tight schedule in this case for a reason.  We are

5    trying to get --

6              THE COURT:  All right.  Well, we don't -- he

7    says some cases allow it; and some cases don't.  I don't

8    need to hear about that now.

9              ATTORNEY KEEFE:  Thank you, your Honor.

10             THE COURT:  All right.  Go back to royalty.

11             ATTORNEY KEEFE:  Just very briefly, your

12   Honor, in fact, even looking at the slide that

13   Mr. Hillman was just using, one of the other problems

14   that I didn't address in the very beginning is the

15   number that we have.  I addressed why I think there are

16   problems with the Aduna licenses and those issues.

17             On the 21.99 percent upper bound, one of the

18   biggest problems with that upper bound is that

19   Mr. Malackowski, using the what we call improper

20   surveys, finding out that News Feed was important to

21   users, that various features of Facebook were important,

22   he then translated those directly to the exact

23   percentage of revenue that Facebook would have achieved

24   because of what users deemed important in these surveys,

25   and he used that to come up with this upper bounded

1    21.99 number.  So that has unreliable come out.

2              The middle factor is the one that I was

3    walking about that goes directly to the *ePlus* case.  And

4    if I could point your Honor to almost all of Page 815 of

5    that ePlus case, Mr. Hillman's middle bar where there's

6    simply some red arrows down and green arrows up is

7    exactly why we have such a problem with

8    Mr. Malackowski's rate.

9              In *ePlus*, we're told that you cannot simply

10   give, and I quote, "unarticulated quantum of higher

11   royalty rate."  The case goes on to say, "He," meaning

12   that expert, "articulated as well that he had considered

13   each of the factors in the cumulative relative rate and

14   then stated that the reasonable royalty rate, which the

15   hypothetical negotiation would produce here, would be in

16   the range of 5 to 6 percent without explaining at all

17   how it was that the application of any one or all of

18   those factors would permit an increase of the base

19   royalty rate of approximately 100 percent."  Just like

20   here, from 2.3 percent up to 5 to 6 percent, it's simply

21   not explained.

22             So we submit that the *ePlus* case controls

23   here because there is no explanation.  He didn't show

24   his homework.

25             THE COURT:  It doesn't control.  It's not

1    controlling.

2              ATTORNEY KEEFE:  I apologize.  It is very

3    instructive, your Honor.

4              THE COURT:  All right.

5              ATTORNEY KEEFE:  Unless your Honor had any

6    further questions, I think that's it.

7              THE COURT:  All right.

8              ATTORNEY KEEFE:  I'm sorry.  I did have one

9    other thing.

10             On the two other things that Mr. Malackowski

11   claims to have looked at, the *Summit 6* settlement, that

12   was a settlement on eve of trial.  Cases like RescueNet

13   have told us to be very leery of those and to give them

14   limited weight.  So I'm not sure why that justifies any

15   type of an upper bound or an upper range.

16             Nor did Mr. Malackowski ever explain whether

17   or not photos are actually incredibly important to

18   Facebook and a very large part of what Facebook does.

19   So simply saying that he thought that photos were only

20   one out of a dozens of features, he didn't test whether

21   or not photos were actually the most important feature.

22             THE COURT:  One of the problems with these

23   reasonable royalty rate cases is that one side says:

24   "Well, I look this, this, and this, and my judgment is

25   it's this."

1          And the other side says, "No, there's no

2     articulable reason why you reached that judgment."

3          Well, there are always judgments.  They're

4     judgments, and typically made by people who have

5     advanced degrees, but have never negotiated a license.

6     It's odd that we have such a system.  I don't know why

7     it is.

8          But one of the problems with your argument

9     that there isn't enough analysis about why it's

10    21 percent or why he used the percentages for News -- to

11    translate directly, those are judgments.  And

12    ultimately, that's what this is all about.  It's a

13    judgment.  I don't remember Malackowski's, but I'm sure

14    he has graduate degrees.

15         Is he an economist or what is he,

16    Mr. Hillman?

17         ATTORNEY HILLMAN:  He's an economist.

18         THE COURT:  Economist who's probably never

19    worked a day in his life in the real world.

20         ATTORNEY HILLMAN:  Actually, he has.  He was

21    in a company -- not any longer -- that valued and

22    auctioned off technology.

23         THE COURT:  So that gives him some leg up.

24    Most experts don't even have that, especially the

25    economists.  Anyway, whatever role he might have played

1    in that is another matter.

2              We used to have a saying for that.  Most of

3    the people we heard from when I served in the Navy would

4    say a lot of things about what we did, but had no time

5    in the cockpit.  And the people who had a lot of time in

6    the cockpit are usually not very vocal.

7              All right.  Do you want to say anything

8    further about that?  I think we should go on now to the

9    issue of the other --

10             ATTORNEY KEEFE:  The technical expert?

11             THE COURT:  Is this the -- Golbeck?

12             ATTORNEY KEEFE:  Yes, your Honor.

13             THE COURT:  All right.

14             ATTORNEY KEEFE:  So this one, I believe, is

15   quite a bit shorter, your Honor.  With respect to the

16   first problem that we have with Dr. Golbeck's testimony,

17   it all revolves around her use -- or rather her nonuse

18   of your Honor's construction for privacy level

19   information.  Your Honor provided a claim

20   construction for privacy --

21             THE COURT:  I have it in front of me.  Now,

22   she said, I think, that it is a rule indicating the

23   metes and bounds of who has permission to view

24   particular content and -- what's the -- what is the

25   exact problem?

1        ATTORNEY KEEFE:  The exact problem, your

2   Honor, is she's narrowing your Honor's definition.  The

3   definition your Honor provided maintains that privacy

4   level information includes information that simply

5   describes which user is permitted to view the content.

6   It doesn't act as a rule which prohibits or mandates

7   that someone not see it or prohibits a specific person

8   from doing something one way or the other.  It doesn't

9   set out metes and bounds and act as a rule which

10  precludes or prohibits something from happening.  The

11  definition given by your Honor is broad enough to

12  include information that simply describes which user is

13  permitted to view the content.  Whether or not they

14  actually can, whether or not they do is not part of the

15  definition.

16        And yet when in deposition and describing

17  exactly how she was applying the term "privacy level

18  information," she said it had to have these metes and

19  bounds and had to actually prohibit or preclude someone

20  from viewing the information.

21        So we maintain that she was not using your

22  Honor's definition, but a narrowed version that they had

23  been trying -- they are trying to use in order to

24  overcome prior art.  That's as simple as the issue is

25  for that.

```
 1              THE COURT:  What's the prior art?

 2              ATTORNEY KEEFE:  The prior art in this

 3    particular instance has to do with the Nazim reference,

 4    which is the way that Yahoo functioned at that time.

 5    The way that Yahoo functioned at the time, you actually

 6    could see who had access to the information, but there

 7    wasn't a specific rule delineating that someone cannot

 8    absolutely -- like actually act as a bar from showing

 9    somebody information.

10              Instead, you knew who was viewing the

11    information.  You knew the identity of the user whose

12    page is being viewed.  And so you knew who was actually

13    able to view the content, like your Honor's construction

14    of -- describes which user is permitted to view the

15    content.

16              THE COURT:  What's the difference between

17    that and metes and bounds of who has permission to view

18    the content?

19              ATTORNEY KEEFE:  It's more the notion that

20    she calls it a rule and the fact that she maintains that

21    it has to be a rule which sets out exactly who can do

22    this instead of merely describing who's been identified

23    as someone who can do it.  So she's trying to narrow

24    down the definition to a rule instead of a mere

25    description you what can happen.
```

1          THE COURT:  How does that relate to this

2     issue about whether the prior art is -- not anticipates,

3     I guess.  It would be that renders it obvious or

4     unobvious.

5          ATTORNEY KEEFE:  Her argument seems to be

6     that Nazim doesn't have privacy level information

7     because there is no rule precluding someone else from

8     looking at the page.  That there's no code in My Yahoo

9     that actually says, "And only this person can view this

10    that's being pointed at."

11          Instead what we showed and what we asked

12    Dr. Golbeck about was the fact that the My Yahoo page

13    that is displayed to a user definitely does show that

14    it's unique to that user and it's going to depend on

15    that one and only user.  And that meets your Honor's

16    definition of privacy level information.  She argues it

17    doesn't because there wasn't a rule setting out who

18    could see it or who could not; in other words,

19    prohibiting anyone from seeing it.

20          THE COURT:  Mr. Hillman.

21          ATTORNEY KEEFE:  There are two other small

22    problems we have with --

23          THE COURT:  Go ahead.  Yes.  I'm sorry.

24          ATTORNEY KEEFE:  They're very short, your

25    Honor.

1          On the second issue, Dr. Golbeck --

2          THE COURT:  This is combining prior art?

3          ATTORNEY KEEFE:  Correct.

4          THE COURT:  All right.

5          ATTORNEY KEEFE:  And Dr. Golbeck merely has

6     a -- essentially an ipse dixit statement that they're

7     not combinable.  She complains that we tried to combine

8     references, but doesn't say why they're noncombinable.

9     There has to be an explanation or rationale behind her

10    saying these shouldn't have been combined instead of a

11    simple bald statement that they're noncombinable.

12         THE COURT:  This is a *Daubert*.

13         ATTORNEY KEEFE:  Correct.

14         THE COURT:  The other one, of course, is

15    simply a failure to use the definition, in your view.

16         ATTORNEY KEEFE:  Correct, your Honor,

17    although it is part of a *Daubert* motion as well

18    because --

19         THE COURT:  Yes, I see that.

20         All right.  So go on.  The third point is

21    the commercial success.

22         ATTORNEY KEEFE:  Correct.  And here it's to

23    the secondary considerations of commercial success.  She

24    does not provide any nexus for saying that Facebook's

25    commercial success is attribute to the patented

1    contribution, and this starts wrapping us back into the

2    first argument.

3              THE COURT:  All right.

4              ATTORNEY KEEFE:  Thank you, your Honor.

5              THE COURT:  Mr. Hillman.

6              ATTORNEY HILLMAN:  Yes, your Honor.  Again,

7    I don't understand, I have to tell you --

8              THE COURT:  I'm sorry?

9              ATTORNEY HILLMAN:  I don't understand how --

10   what the argument is even if she's not complying with

11   your Honor's definition -- construction of the privacy

12   level information.

13             THE COURT:  Well, I guess your not

14   understanding isn't helpful to me.  I wouldn't make that

15   comment.  It's never helpful for an advocate to say, "I

16   don't understand something," because you run the risk

17   that I do.

18             ATTORNEY HILLMAN:  I apologize, your Honor.

19             THE COURT:  So I think it's your position

20   that I'm interested in understanding now.

21             ATTORNEY HILLMAN:  Our position, your Honor,

22   is that when the construction says it's information that

23   describes or specifies which users --

24             THE COURT:  User and an s.  So it could be a

25   single person.

1          ATTORNEY HILLMAN:  It can be a single

2     person.

3          THE COURT:  Which user, user, or categories

4     of users are permitted to view a particular content.  Go

5     on.

6          ATTORNEY HILLMAN:  So we see that as, in

7     substance, saying that you have to describe the metes

8     and bounds of who is permitted to view the material.

9     And metes and bounds doesn't change anything.  It says

10    which user, users, or categories of users are permitted.

11    And the prior art that Ms. Keefe is relying on doesn't

12    do that.  At most it says, "Well, so-and-so is now

13    viewing this, and they're entitled to view it."  But it

14    doesn't tell you what the metes and bounds are.

15         THE COURT:  It doesn't have to.  I didn't

16    say anything about metes and bounds.

17         ATTORNEY HILLMAN:  We say that the word --

18    our position is when you say which use, users, or

19    categories of users are permitted, that means the

20    information has to describe or specify the individual or

21    group that is permitted to view the material.

22         THE COURT:  And what does the prior art do?

23         ATTORNEY HILLMAN:  It doesn't do that.

24         THE COURT:  What does it do?

25         ATTORNEY HILLMAN:  It simply is prior art in

1    which some individual is viewing the material.

2              THE COURT:  Allowed to view it.

3              ATTORNEY HILLMAN:  Yes.

4              THE COURT:  Then why isn't that the same

5    thing?

6              ATTORNEY HILLMAN:  Because that information

7    doesn't tell which users are permitted to.  It only --

8              THE COURT:  If it has one user, that's

9    enough, isn't it?

10             ATTORNEY HILLMAN:  But from the fact that

11   that one user is viewing it, there's no information that

12   tells you whether that's the only user that can view it

13   or whether there are other users that can view it.  And

14   so it doesn't tell you which users are permitted.  The

15   fact that you or I happen to be able to --

16             THE COURT:  Is there anything in the

17   definition that says that the configuration information

18   has to give -- has to identify everyone who's allowed to

19   use it?

20             ATTORNEY HILLMAN:  I would argue that the

21   word "which" implies that, yes, your Honor.

22             THE COURT:  Let me hear from you, Ms. Keefe.

23             ATTORNEY KEEFE:  Absolutely not, your Honor.

24   In fact, it's a comprising claim.  And so configuration

25   information that describes which user is permitted to

1   view a particular content data is easily satisfied by

2   the Nazim reference which shows the one user who is

3   allowed to view.

4          THE COURT:  Let me ask you this:  Suppose

5   the configuration information -- the privacy level

6   information the configuration information identifies one

7   person and, in fact, it's a bunch of people, but the

8   configuration information identifies only one.

9          Does that meet the definition of privacy

10  level information?

11         ATTORNEY KEEFE:  Yes, it does, your Honor.

12         THE COURT:  Why?

13         ATTORNEY KEEFE:  Because it -- there is

14  information that describes that user that is permitted

15  to view the particular information.  The fact that it's

16  only one --

17         THE COURT:  He says that the definition that

18  I gave says which -- specifies which user, and he says

19  that implies that you've got to tell -- got to tell us

20  about everybody who can use it.

21         ATTORNEY KEEFE:  I disagree, your Honor.

22  Which user is you can use it or you can use it or I can

23  use it.  It doesn't have to be, "And here's a list that

24  shows Heidi can use it, but Ms. Stameshkin cannot, nor

25  can Mr. Marowitz, nor can Judge Ellis."  It's not about

1    that, your Honor.  It's just information that describes

2    which user is permitted to use it.

3            The fact that I'm in that reference viewing

4    my information, I am permitted to view it.  That's --

5    that's all it requires.  If doesn't require anything

6    beyond that.  It doesn't require a full list or a rule

7    or et cetera, or anything other than this user can use

8    it while they're using it.

9            THE COURT:  All right.

10           ATTORNEY KEEFE:  Thank you, your Honor.

11           THE COURT:  Now, let me take a recess here

12   for a few minutes.  In fact, I have under advisement a

13   summary judgment motion.

14           ATTORNEY KEEFE:  That is correct, your

15   Honor.

16           THE COURT:  What, if any, effect do the

17   issues that have been argued today have on that?

18           ATTORNEY KEEFE:  Interesting question, your

19   Honor.  It depends on what --

20           THE COURT:  Not interesting.  It's

21   necessary.

22           ATTORNEY KEEFE:  It is, your Honor, in the

23   sense that the summary judgment motion itself is

24   independent of these issues.  However, as happened in

25   the *Motorola versus Apple* case decided by Judge Posner,

 1    he decided the damage is *Daubert* and then didn't get to

 2    the merits of the summary judgment motion.

 3              THE COURT:  As a district judge?

 4              ATTORNEY KEEFE:  He is a Federal Circuit

 5    judge who was sitting by designation in the --

 6              THE COURT:  I know who he is.

 7              ATTORNEY KEEFE:  -- Seventh Circuit.  Sorry

 8    about that.

 9              THE COURT:  He was sitting as a district

10    judge.

11              ATTORNEY KEEFE:  He was.  Again, not

12    precedential, but just informative.

13              THE COURT:  His colleague on the Seventh

14    Circuit didn't fare well.  Judge Easterbrook sat by

15    designation as a district judge, and I had occasion to

16    read his opinion which he gave extemporaneously, and it

17    was published like that.  Very good opinion.  It was

18    reversed.

19              Was Posner's decision appealed.

20              ATTORNEY KEEFE:  I believe the case

21    resolved afterwards, huh?

22              I am told it actually is pending on appeal

23    right now, your Honor.

24              THE COURT:  Tell me what, again, Posner --

25              ATTORNEY KEEFE:  In that particular case,

 1    there were summary judgment motions pending.  There was

 2    also a series of *Daubert* challenges to -- very similar

 3    to the situation we have here.  In that case, Judge

 4    Posner threw out both sides' damages experts and

 5    considered the issue of the entire case to be resolved.

 6    Since there was no damage, there was no standing.  And

 7    so the case was over and did not then reach the issue of

 8    the summary judgments that were in front of him.  And so

 9    that could happen here in the sense that the summary

10    judgment motion --

11            THE COURT:  The other side of that would be

12    Mr. Hillman saying, "Oh, no, we want a chance to do-over

13    on the damages," and then there will standing and there

14    will be all the rest.  So it would make summary judgment

15    quite alive.  But what I was asking was a different

16    question.  I think I had --

17            ATTORNEY KEEFE:  They are independent of

18    each other.  The issues that we raised with Dr. Golbeck

19    do not affect the summary judgment.

20            THE COURT:  You agree with that,

21    Mr. Hillman?

22            ATTORNEY HILLMAN:  I do, your Honor.

23            THE COURT:  All right.  Go have lunch for

24    30 minutes, settle the matter, but come back at quarter

25    to 1:00 and we'll deal with this.

1          ATTORNEY KEEFE:  Thank you, your Honor.

2          THE COURT:  All right.  Thank you.  I have

3     your slides, both of you.

4          ATTORNEY KEEFE:  Thank you, your Honor.

5          THE COURT:  Is that right?

6          ATTORNEY KEEFE:  That is correct.

7          THE COURT:  Your book I have, Mr. Hillman?

8          ATTORNEY HILLMAN:  That is correct, your

9     Honor.

10          May we leave our papers here?

11          THE COURT:  Yes, you may.  Yes, you may.

12          ATTORNEY KEEFE:  Thank you, your Honor.

13          THE COURT:  Thank you.

14          (Court recessed at 12:17 p.m.)

15          (Court called to order at 1:50 p.m.)

16          THE COURT:  Well, there are two motions

17     pending that were argued today.  There's also summary

18     judgment.  And I think I'm going to -- I've devoted some

19     effort already to summary judgment, but I think I'm

20     going to devote more effort to these motions more

21     immediately.

22          The argument about whether the revenue

23     stream has been appropriately related to the patented

24     improvement is an interesting and important question for

25     me to resolve as well as the Rite Hite convoy issue.

1    The arguments were helpful, but I'm not confident that I

2    am able to resolve it today.  I'm going to review these

3    cases carefully.

4              There are always -- the factual description

5    that you gave me of the cases is helpful, but I also

6    have to come to grips with what the real rationale is of

7    these cases and how it should be applied to the facts of

8    this case.

9              The motion with respect to privacy level

10   information is really a -- in effect, causes me to

11   examine carefully again the Markman determination that I

12   made and to see whether the construction that the

13   defendant is placed on it is the correct one or the one

14   that the plaintiff places on it.  So those will take me

15   some time.

16             So I'm going to take them under advisement,

17   and I'm going to let you hear from me as soon as

18   possible on those.  And, of course, then summary

19   judgment, if appropriate.  We have a December 10th date,

20   and so I'm going to move with alacrity.  But I have, for

21   some reason, an abundance of patent cases right now.

22             Many years ago, we had more patent cases

23   than even the Eastern District of Texas ever imagined.

24   There were four judges here, and we each had about

25   40 cases apiece, and that was crazy.  That was

1    impossible.  So we determined -- 40 may be the wrong

2    number.  Maybe it was 15 or 20.  But still it was out --

3    given the fact that we have a number of other cases.

4            Interestingly, this is one of the busiest

5    per judge in the country in the criminal area.  Just

6    look it up.  Its very busy.  So we've farmed them out to

7    the district.  In other words, if you filed in

8    Alexandria, you might end up in Norfolk.  That's still

9    true despite the fact that many of us -- no, strike

10   that -- despite the fact that at least one of us thinks

11   we ought not to do that anymore, but that's not

12   sufficient.

13           So they still go out, but for some reason

14   I've ended up with a number of them.  There's been an

15   explosion of these sort of business method patents, and

16   they pose very difficult questions for both plaintiff

17   and defendant.

18           Anyway, your arguments have been helpful.

19   I'm sure you will ask Mr. Rodriquez to supply you with a

20   transcript, which he will be happy to do.

21           MR. RODRIQUEZ:  That is absolutely correct.

22           THE COURT:  It will help support his great

23   villa in St. Thomas and his large vehicles.

24           Thank you, and we'll proceed in that

25   fashion.  And I asked questions about what would happen

1    if, and the short answer is we'll cross any bridge if we

2    come to it and when we come to it.  I don't know what

3    the result's going to be yet, and I don't know what the

4    effect of that result is going to be yet.  But when I

5    get to that bridge, we'll cross it.  Thank you.

6              ATTORNEY KEEFE:  Thank you, your Honor.

7              ATTORNEY HILLMAN:  Thank you, your Honor.

8              THE COURT:  You all have a nice weekend.

9    Thank you.

10             ATTORNEY KEEFE:  You do the same, your

11   Honor.

12             (Court adjourned at 12:55.)

13                        ---

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                            CERTIFICATE

5

6            I, MICHAEL A. RODRIQUEZ, an Official Court

7    Reporter for the United States District Court, in the

8    Eastern District of Virginia, Alexandria Division, do

9    hereby certify that I reported by machine shorthand, in

10   my official capacity, the proceedings had upon the

11   motions hearing in the case of REMBRANDT SOCIAL MEDIA,

12   LP, v. FACEBOOK, INCORPORATED, et al.

13

14            I further certify that I was authorized and

15   did report by stenotype the proceedings in said motions

16   hearing, and that the foregoing pages, numbered 1 to 61,

17   inclusive, constitute the official transcript of said

18   proceedings as taken from my machine shorthand notes.

19

20            IN WITNESS WHEREOF, I have hereto subscribed

21   my name this __16th__ day of __October_____, 2013.

22

23

                              _____/S/_____
24                            Michael A. Rodriquez, RPR/CM/RMR
                                  Official Court Reporter
25

ADD0305–ADD0365
Excerpts of Deposition of
Dr. Jennifer A. Golbeck
Confidential Pursuant to Protective Order

# In The Matter Of:

*REMBRANDT SOCIAL MEDIA, LP*
*v.*
*FACEBOOK, INC. and ADDTHIS, INC.*

_____

*YORAM (JERRY) WIND, Ph.D.  - Vol. 1*
**August 21, 2013**

_____

**MERRILL CORPORATION**
**LegaLink, Inc.**

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION
CIVIL ACTION NO. 1:13 cv 158 (TSE) (TRJ)

REMBRANDT SOCIAL MEDIAL, LP,      :
          Plaintiff,             :
                                 :
     v.                          :
                                 :
FACEBOOK, INC., and ADDTHIS,     :
INC.,                            :
          Defendant.             :


          Transcript of the videotape deposition of

YORAM (JERRY) WIND, Ph.D., called for Oral

Examination in the above-captioned matter, said

deposition taken by and before SILVIA P. WAGE, a

Certified Shorthand Reporter, Certified Realtime

Reporter, Registered Professional Reporter, and

Notary Public for the State of Pennsylvania, New

Jersey, New York and Delaware, at the offices of

BLANK & ROME LP, One Logan Place, 130 North 18th

Street, 11th Floor, Conference Room 1111,

Philadelphia, Pennsylvania, on Wednesday, August 21,

2013, commencing at 9:35 a.m.


          JOB NO. 2005-452812

ADD0367

| | |
|---|---|
| 1 | (Deposition Exhibit Wind 1, Consumer's |
| 2 | Perceptions of the Importance of the Various |
| 3 | Features of Facebook June 2013 prepared by Dr. Wind, |
| 4 | was marked for identification.) | 09:26 |
| 5 | THE VIDEOGRAPHER:  This is the video | 09:26 |
| 6 | operator speaking, David Levin of Merrill Legal | 09:26 |
| 7 | Solutions, 225 Varick Street, New York, New York | 09:26 |
| 8 | 10014. | 09:26 |
| 9 | Today is Wednesday, August 21st, 2013, and | 09:26 |
| 10 | the time is 9:27 a.m. | 09:26 |
| 11 | We are at offices of Blank Rome, 18 North | 09:27 |
| 12 | Cherry Street, 11th floor, Philadelphia, | 09:27 |
| 13 | Pennsylvania to take the videotape deposition of | 09:27 |
| 14 | Yoram Wind, in the matter of Rembrandt Social Media | 09:27 |
| 15 | LP versus Facebook Incorporated and AddThis | 09:27 |
| 16 | Incorporated, in the United States District Court | 09:27 |
| 17 | for the Eastern District of Virginia, Alexandria, | 09:27 |
| 18 | Virginia, Civil Action No. 1:13 CV 158. | 09:27 |
| 19 | Will counsel please introduce themselves for | 09:27 |
| 20 | the record. | 09:27 |
| 21 | MR. DAVIS:  Ahmed Davis, Fish & | 09:27 |
| 22 | Richardson on behalf of Plaintiff as well as the | 09:27 |
| 23 | witness, Dr. Wind. | 09:27 |
| 24 | MR. MORTON:  Philip Morton from | 09:27 |
| 25 | Cooley LLP on behalf of the Defendant Facebook Inc. | 09:27 |

| | | |
|---|---|---|
| 1 | tells you that for each of the features, how many | 12:14 |
| 2 | points out of hundred on average were assigned to it | 12:14 |
| 3 | and what were the confidence intervals around it. | 12:14 |
| 4 | Q.     And it says it's for the global | 12:14 |
| 5 | unweighted Facebook features? | 12:14 |
| 6 | A.     Right. | 12:14 |
| 7 | Q.     So this is based on the raw data that | 12:14 |
| 8 | the survey recorded? | 12:14 |
| 9 | A.     Correct.  It takes the US respondent | 12:14 |
| 10 | base respond to 11 countries, pull them together and | 12:14 |
| 11 | that is the result. | 12:14 |
| 12 | Q.     So, in this data, there was no | 12:14 |
| 13 | attempt to weight the data based on the, you know, | 12:14 |
| 14 | percentage of global Facebook user in the US versus | 12:14 |
| 15 | international? | 12:14 |
| 16 | A.     Correct.  In the previous chart on | 12:14 |
| 17 | Table A4 is the weighted that is reflecting | 12:14 |
| 18 | 16 percent is US and 84 percent is the | 12:14 |
| 19 | international, the 11 countries. | 12:14 |
| 20 | Q.     Okay.  So turning back to the page | 12:14 |
| 21 | before, A4, Page 74. | 12:15 |
| 22 | Okay.  So this is the weighted data? | 12:15 |
| 23 | A.     Correct. | 12:15 |
| 24 | Q.     Okay.  And so what you convey here is | 12:15 |
| 25 | the relative importance of each of the features as | 12:15 |

| | | |
|---|---|---|
| 1 | you determine from the survey and then after the | 12:15 |
| 2 | data was weighted? | 12:15 |
| 3 | A.    Correct. | 12:15 |
| 4 | Q.    Okay.  Now, how do each of the share | 12:15 |
| 5 | of points correlate to Facebook's revenue? | 12:15 |
| 6 | MR. DAVIS:  Object to the form. | 12:16 |
| 7 | You can answer. | 12:16 |
| 8 | A.    By itself, it doesn't, you know, | 12:16 |
| 9 | because we need additional analysis to try to do it. | 12:16 |
| 10 | Q.    What kind of analysis do you need to | 12:16 |
| 11 | do that? | 12:16 |
| 12 | MR. DAVIS:  Objection, calls for | 12:16 |
| 13 | speculation. | 12:16 |
| 14 | You can answer. | 12:16 |
| 15 | A.    You can do a number of analysis.  I'm | 12:16 |
| 16 | not sure what the damage expert did because I've not | 12:16 |
| 17 | seen his report.  But the idea is if you have -- | 12:16 |
| 18 | these are the characteristics, basically, of the way | 12:16 |
| 19 | people perceive the relative importance of the | 12:16 |
| 20 | various features.  If you now can relate this to the | 12:16 |
| 21 | actual usage of people, you can get an answer.  If | 12:16 |
| 22 | you can relate this, as we discussed earlier today, | 12:16 |
| 23 | to the advertiser's perception of the value of | 12:16 |
| 24 | advertising there, you can start estimating.  So | 12:16 |
| 25 | there are many ways in which you can start doing it. | 12:16 |

| | |
|---|---|
| 1     All what I did is just do this analysis to | 12:16 |
| 2   try to answer the question, what is the relative | 12:16 |
| 3   importance of each of the features as a driver of | 12:17 |
| 4   the usage of Facebook.  And now if you want to try | 12:17 |
| 5   to link to revenue, you need additional analysis. | 12:17 |
| 6         Q.     So taking an example, the fourth item | 12:17 |
| 7   from the bottom, Facebook's targeted ads, the | 12:17 |
| 8   relative importance of this feature is 0.6 percent. | 12:17 |
| 9   And does that mean that 0.6 percent of Facebook's | 12:17 |
| 10   revenue can be attributed to that feature? | 12:17 |
| 11         MR. DAVIS:  Object to the form. | 12:17 |
| 12     A.     Not -- | 12:17 |
| 13         MR. DAVIS:  Hold on.  Hold on. | 12:17 |
| 14     Object to form, incomplete hypothetical. | 12:17 |
| 15     You can answer. | 12:17 |
| 16         THE WITNESS:  Sorry. | 12:17 |
| 17         MR. DAVIS:  It's alright.  You have | 12:17 |
| 18   to give me a second to put an objection in. | 12:17 |
| 19     A.     Not by itself.  And, also, keep in | 12:17 |
| 20   mind that this is the consumer perception.  So, from | 12:17 |
| 21   consumer point of view, they don't like ads, | 12:18 |
| 22   especially, they don't like interrupting meaningless | 12:18 |
| 23   ads, yet ads is the source of revenue of Facebook. | 12:18 |
| 24   So by itself looking at this variable, you cannot | 12:18 |
| 25   say anything. | 12:18 |

| | |
|---|---|
| 1 | The reality is that people do advertise. | 12:18 |
| 2 | And the question is how attractive is it for the | 12:18 |
| 3 | advertiser to advertise on Facebook. And so this is | 12:18 |
| 4 | definitely -- this is the one variable where you'll | 12:18 |
| 5 | have a major discrepancy and you would expect it | 12:18 |
| 6 | between the perception of the consumers and the | 12:18 |
| 7 | perception of the advertisers. | 12:18 |
| 8 | Because for the advertiser, I don't recall | 12:18 |
| 9 | what Dr. Gelb found in his study, but I would | 12:18 |
| 10 | suspect this would be a much more important | 12:18 |
| 11 | attribute for advertisers. | 12:18 |
| 12 | Q. But, to be clear, you don't believe | 12:19 |
| 13 | that 0.6 percent of Facebook's revenue is attributed | 12:19 |
| 14 | to targeted advertising? | 12:19 |
| 15 | MR. DAVIS: Objection to form. | 12:19 |
| 16 | A. The question was not on revenue. The | 12:19 |
| 17 | whole task, all of this data -- we can take it | 12:19 |
| 18 | basically for each one of those features -- they | 12:19 |
| 19 | were not asked in term of revenue. They were asked | 12:19 |
| 20 | primarily for user -- Facebook users in term of how | 12:19 |
| 21 | important is it as a driver of your usage. That's | 12:19 |
| 22 | all we are basically answering here. | 12:19 |
| 23 | You're trying to make another kind of leap | 12:19 |
| 24 | here. And the link between this data and the | 12:19 |
| 25 | revenue question has to be the subject of a separate | 12:19 |

| | | |
|---|---|---|
| 1 | analysis. | 12:19 |
| 2 | Q. Okay. So, just to be clear, you | 12:19 |
| 3 | don't contend that the relative importance of each | 12:20 |
| 4 | of these features is directly correlated to | 12:20 |
| 5 | Facebook's revenue? | 12:20 |
| 6 | MR. DAVIS: Object to the form, asked | 12:20 |
| 7 | and answered, incomplete hypothetical. | 12:20 |
| 8 | You can answer. | 12:20 |
| 9 | A. Now you changed on me the basis. You | 12:20 |
| 10 | added the word "correlate" here. | 12:20 |
| 11 | It may be correlated. But keep in mind that | 12:20 |
| 12 | I'm the -- the data here reflect very simple direct | 12:20 |
| 13 | questions to consumers on how important is it, the | 12:20 |
| 14 | relative importance, in driving new usage of | 12:20 |
| 15 | Facebook. | 12:20 |
| 16 | Anything else I want to do with this data, | 12:20 |
| 17 | any statistical analysis, any modelling I want to do | 12:20 |
| 18 | with this is fine, but it's separate that will try | 12:20 |
| 19 | to link this and perhaps other data sources to | 12:20 |
| 20 | revenues. So they may be correlated in some | 12:20 |
| 21 | analysis. | 12:20 |
| 22 | But the data that we represent is the data | 12:20 |
| 23 | that tells us that these are the relative importance | 12:21 |
| 24 | consumer attributes to each of these features as a | 12:21 |
| 25 | driver of their usage of Facebook. | 12:21 |

| | | |
|---|---|---|
| 1 | Q.      Okay.  And you're not expressing any | 12:21 |
| 2 | opinion about how the users usage of Facebook is | 12:21 |
| 3 | related to revenue? | 12:21 |
| 4 | A.      Correct. | 12:21 |
| 5 | Q.      Okay. | 12:21 |
| 6 | A.      Because I've not done any analysis | 12:21 |
| 7 | along this line nor was I asked to.  I was just | 12:21 |
| 8 | asked to provide this as input to the damage model. | 12:21 |
| 9 |      So I assume the damage model is the one to | 12:21 |
| 10 | try to establish the link.  I am not.  I have not | 12:21 |
| 11 | tried to do anything along this line. | 12:21 |
| 12 | Q.      Okay.  And you're not expressing any | 12:21 |
| 13 | opinion about how the surveyed user's usage of | 12:21 |
| 14 | Facebook is related to the demand for these | 12:21 |
| 15 | particular features? | 12:21 |
| 16 | A.      No.  I think that, basically -- | 12:22 |
| 17 | again, I cannot give you a quantifiable number of | 12:22 |
| 18 | the relative impact of this on demand.  But given | 12:22 |
| 19 | the fact that we're using here all features that the | 12:22 |
| 20 | respondent actually uses and given my general | 12:22 |
| 21 | experience with this type of methodology, I would | 12:22 |
| 22 | say that these will be highly predictive of demand. | 12:22 |
| 23 |      And I've used many, many studies like this | 12:22 |
| 24 | that use constant sum evaluation with other methods | 12:22 |
| 25 | with it in providing companies guidelines for | 12:22 |

1                    C E R T I F I C A T E

2

3            I, SILVIA P. WAGE, a Notary Public and

4    Certified Court Reporter of the State of New Jersey,

5    License No. 30X100182700, Certified Realtime

6    Reporter and Registered Professional Reporter, do

7    hereby certify that prior to the commencement of the

8    examination, YORAM (JERRY) WIND, Ph.D., was duly

9    sworn by me to testify the truth, the whole truth

10   and nothing but the truth.

11           I DO FURTHER CERTIFY that the foregoing is a

12   true and accurate transcript of the testimony as

13   taken stenographically by and before me at the time,

14   place and on the date hereinbefore set forth.

15           I DO FURTHER CERTIFY that I am neither a

16   relative nor employee nor attorney nor counsel of

17   any of the parties to this action, and that I am

18   neither a relative nor employee of such attorney or

19   counsel, and that I am not financially interested in

20   the action.

21

22

23   _____

24   Notary Public of the State of New Jersey
     My Commission expires November 9, 2012
25   Dated:  August 23, 2013

ADD0376–ADD0426
Expert Rebuttal Report of
Professor Marco Iansiti
Confidential Pursuant to Protective Order

## CERTIFICATE OF SERVICE

I, Lucas Townsend, hereby certify that on December 26, 2013, copies of the following documents described as:

- Facebook, Inc.'s Non-confidential Response to Rembrandt Social Media, LP's Petition for Allowance of An Interlocutory Appeal
- Addendum
- Certificate of Interest for Facebook, Inc.

were electronically filed with the Clerk of the Court using CM/ECF and served via electronic mail on the following counsel:

Ahmed J. Davis
Fish & Richardson P.C.
1425 K Street, N.W., 11th Floor
Washington, DC  20005
Tel:  (202) 783-5057
Fax: (202)783-2331
adavis@fr.com

*Counsel for Rembrandt Social Media, LP*

/s/ *Lucas C. Townsend*
Lucas C. Townsend
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
(202) 887-3731
(202) 530-4254 (fax)
ltownsend@gibsondunn.com